195 N.J. Super. 354 (1984)
479 A.2d 425
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, CROSS-APPELLANT,
v.
BRUCE CURTIS, DEFENDANT-APPELLANT, CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 6, 1984.
Decided July 18, 1984.
*359 Before Judges MATTHEWS, J.H. COLEMAN and GAULKIN.
Michael D. Schottland argued the cause for appellant-cross-respondent (Chamlin, Schottland, Rosen, Cavanagh & Uliano, attorneys; Michael D. Schottland and Charles J. Uliano, on the brief).
Paul F. Chaiet, First Assistant Prosecutor, argued for respondent-cross-appellant (John A. Kaye, Prosecutor of Monmouth County, attorney; Paul F. Chaiet, of counsel, and on the brief).
Arlene R. Weiss, Deputy Attorney General, argued the constitutionality of N.J.S.A. 2C:11-4 (Irwin I. Kimmelman, Attorney General of New Jersey, Amicus Curiae, attorney; Arlene *360 R. Weiss, of counsel; Arlene R. Weiss and Jane A. Grall, Deputy Attorneys General, on the brief).
The opinion of the court was delivered by COLEMAN, J.H., J.A.D.
This appeal requires us to decide what if any difference exists between aggravated manslaughter and reckless manslaughter. Defendant was tried to a jury for the murder of Rosemary Podgis, contrary to N.J.S.A. 2C:11-3, and theft of a van, contrary to N.J.S.A. 2C:20-3a. The jury was instructed on reckless manslaughter and aggravated manslaughter as lesser included offenses of the murder. He was acquitted of murder and the theft, but he was found guilty of aggravated manslaughter. The court imposed a custodial sentence of 20 years with 10 years of parole ineligibility. We now affirm.
Scott Franz was indicted for the murder of his stepfather, Alfred Podgis, on July 5, 1982. Defendant was indicted for the murder of Rosemary Podgis, Scott Franz's mother, on the same date. Franz pled guilty to murder and testified for the State while he was waiting to be sentenced. Defendant elected not to testify.
Franz and defendant graduated from Kings Edgehill School, a private boarding school in Nova Scotia, on June 18, 1982. Defendant resided in Canada while Franz resided in the Podgis home located at 401 Euclid Avenue, Loch Arbor, Allenhurst, New Jersey, where the homicides occurred over the July 4, 1982 weekend. Franz's stepfather and mother invited defendant to New Jersey to visit with Franz. Franz and defendant had been friends for two years.
The events in the Podgis household during the week preceding the homicides are highly relevant. Franz regarded his stepfather as physically abusive. He apparently loved his mother. On June 29, 1982, Franz and his stepfather went to the Newark Airport to pick up defendant who was flying in from Canada. The plane was late arriving. Franz and his *361 stepfather became embroiled in a heated argument because the stepfather thought the lateness of the plane would cost additional parking fees and would also interfere with a baseball date. Defendant was eventually transported from the airport to the Podgis home where he spent the next day uneventfully.
Franz testified that on July 1, he worked for a few hours and then went to the Englishtown Post Office to visit his mother at her job. His mother asked him to put gas in her car and to purchase a box of .30 caliber ammunition. Franz purchased the ammunition in the presence of defendant. The ammunition was brought to the Podgis home where it was placed on a table. Later that day Franz and his stepfather had an argument over a $389 Social Security check which Franz received monthly because of the death of his natural father.
Franz further testified that on July 2 there was another argument between him and his stepfather because Mr. Podgis left for work without taking Franz. Mr. Podgis punched Franz as Mrs. Podgis, defendant and Franz were leaving the house to go out for dinner.
On July 3, while Franz and defendant were cutting the lawn at about 11:30 a.m., they observed Mr. Podgis place some boxes containing rifles into one of the motor vehicles, cover them with towels and then lock the motor vehicle. Franz described his stepfather as being "hyper" because his face was totally red and he was walking in an unusual manner. Franz and defendant then went to the Seaview Square Mall where they remained until 9:30 p.m. When they returned home, Franz overheard his parents arguing. He heard Mr. Podgis say he never should have married Mrs. Podgis because some of her children are too much trouble. Later that night when Mr. Podgis came outside to take Franz's moped inside, defendant and Franz heard him say, "If I get my hands on that son-of-a-bitching kid, I'll kill him." He was referring to Franz. Defendant and Franz were afraid to enter the house that night until very late.
*362 Franz also testified that on Sunday morning, July 4, he went upstairs to get his checkbook and to obtain defendant's travel checks. While upstairs Mr. Podgis fired a rifle shot at Franz. Franz dropped a tote bag he was carrying, which contained the belongings of defendant, and ran out of the house. Defendant and Franz spent the remainder of the day in Asbury Park. They returned home very late that night. Defendant indicated to Franz that Mr. Podgis "was a total pain and that we have to pay him back for making us stay outside." Later that Sunday evening, Mrs. Podgis indicated to Franz that her husband had found two of his collector guns underneath the mattress in the bedroom where defendant had been staying.
Significantly, before Franz and defendant entered the house late Sunday night, Franz broke into the locked motor vehicle containing the box of rifles and took two rifles and a box of bullets. These guns were to be used as protection by Franz and defendant whenever they would try to get back into the house to collect their personal belongings before leaving town. They felt they needed protection since Mr. Podgis had shot at Franz that morning. One of the guns removed from the locked vehicle was loaded. Franz unloaded that gun by ejecting the shells. He then loaded one-half of the shells into each of the two rifles. Defendant said he did not know how to load the rifle. Franz handed one of the loaded rifles to defendant with shells in the magazine, but no shell was in the firing chamber. The hammer was in the safety position. Defendant and Franz slept Sunday night on the sofa in the living room with the rifles on or underneath the sofa.
On Monday morning, July 5, defendant and Franz got up at approximately 7:30 a.m. Mrs. Podgis went into the kitchen to prepare french toast for breakfast. Defendant remained in the living room on the sofa with his loaded rifle on or underneath the sofa. Franz decided that he wanted to go upstairs to take a shower. However, before leaving to go upstairs, Franz told defendant "If Al [Alfred Podgis] tries anything, like shooting at me, then I am going to shoot him, and if you have to go out of *363 the house shooting, go ahead." Franz took with him a loaded .30 caliber rifle upstairs to take his shower.
Franz and his stepfather had an argument in the master bedroom as to why the stepfather had shot at Franz on Sunday. Mr. Podgis also accused Franz of stealing everything in the house and pawning it like his brother Mark. During the argument, Mr. Podgis held a .22 caliber rifle. Franz said Mr. Podgis then fired shots at him. Neither struck Franz. He fired from a leaning up position on the bed. Franz levered his rifle to move a shell from the magazine into the firing chamber. Franz fired a single shot that struck Mr. Podgis in the head blowing out most of his brain. Less than a minute after Franz fired his weapon, he heard a weapon discharge downstairs. Mrs. Podgis was killed downstairs by defendant with a rifle blast into her abdomen. The bodies were stuffed into a steamer trunk and a sleeping bag and dumped down an embankment in Pennsylvania. Franz and defendant then fled to Texas where they were arrested.

I
First we address defendant's contention that the court erred in failing to properly instruct the jury on the difference between reckless manslaughter and aggravated manslaughter. The statutory definition of manslaughter is found in N.J.S.A. 2C:11-4. Subsection a. provides "Criminal homicide constitutes aggravated manslaughter when the actor recklessly causes death under circumstances manifesting extreme indifference to human life." Subsection b. provides "Criminal homicide constitutes manslaughter when: (1) it is committed recklessly; ...."
The Legislature thus enumerated two elements for aggravated manslaughter, a first degree crime: (1) a reckless causing of death by the actor and (2) circumstances manifesting extreme indifference to human life. Reckless manslaughter is a second degree crime and requires only proof that the actor recklessly caused the death of another human being. The *364 definition of recklessness applicable to both forms of manslaughter is found in N.J.S.A. 2C:2-2b.(3). That definition requires a showing that the actor "consciously disregarded a substantial and unjustifiable risk" that death "will result from his conduct" and further specifies that "the risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation."
The second and distinguishing element of aggravated manslaughter is not defined in the Code. We perceive, however, that the Legislature intended for this second element to require that the recklessness must involve a higher degree of probability that death will result from the actor's conduct because it made aggravated manslaughter a first degree crime and reckless manslaughter only a second degree crime.
We are persuaded that the difference between aggravated manslaughter and reckless manslaughter is the difference in the degree of the risk that death will result from defendant's conduct. This difference in degree is to be established by the second element in aggravated manslaughter which is not required in a reckless manslaughter case. We envision that the Legislature intended that the degree of risk in reckless manslaughter be a mere possibility of death. In aggravated manslaughter, however, the additional element that death be caused "under circumstances manifesting extreme indifference to human life" elevates the risk level from a mere possibility to a probability.
Hence, the Legislature intended for the higher degree of recklessness to distinguish aggravated manslaughter from reckless manslaughter. It is that risk which, the Legislature has found, warrants grading aggravated manslaughter as a first degree crime. The relevant "circumstances" are objective and do not depend on defendant's state of mind. The degree of *365 recklessness must be determined from all the surrounding circumstances. The ultimate question for the factfinder is whether the homicide was committed under circumstances involving a mere possibility of death or did the circumstances involve a probability of death. If the former, the verdict must be reckless manslaughter, but if the latter the verdict must be aggravated manslaughter.

II
When the trial judge charged the jury in this case on aggravated manslaughter, he stated that the recklessness meant the same in both reckless manslaughter and in aggravated manslaughter. As to the second element under aggravated manslaughter, he told the jury that "under circumstances manifesting extreme indifference to human life" meant that defendant must have been aware that the risk of death or serious bodily injury is very great and that defendant conducted himself with no regard for that risk. The judge further explained that causing death under circumstances manifesting extreme indifference to human life meant "in other words, the State must prove the defendant acted in a way that showed he was indifferent to whether or not the victim or anyone else involved in the situation lived or died, that is, the defendant acted in a way which showed that he did not care that someone will be killed."
In response to a question from the jury, the judge reinstructed the jury on aggravated manslaughter. He told the jury that the difference between reckless manslaughter and aggravated manslaughter is a matter of the degree of recklessness. He stated that in aggravated manslaughter the recklessness had to demonstrate "an extreme indifference to the value of human life." He instructed that if the jury found a degree of recklessness that was less than "an extreme indifference to the value of human life" the verdict could only be reckless manslaughter.
*366 The judge defined reckless manslaughter as requiring a conscious disregard of a significant and unjustifiable risk that death would result from the actor's conduct. The jury was told that the degree of the recklessness was less than that required for aggravated manslaughter. He specifically stated "If you find that the defendant acted recklessly, but that his recklessness was not so extreme as to evidence an indifference to the value of human life, the homicide is reckless manslaughter rather than aggravated manslaughter."
When passing upon the propriety of a trial court's instruction to the jury, we must examine the entire charge rather than isolated parts thereof. This is so because it is impossible for a judge to state all of the law in one simple concise sentence. See State v. Hipplewith, 33 N.J. 300, 317 (1960). We have, therefore, examined the charge in its entirety to determine the existence of any impropriety or prejudicial effect upon defendant. State v. Wilbely, 63 N.J. 420, 422 (1973). While the judge did not define the degree of recklessness in terms of possibilities or probabilities that death would result from defendant's conduct, the instruction as a whole informed the jury that in order to return a verdict for reckless manslaughter, it had to be convinced beyond a reasonable doubt that defendant's conduct in the circumstances was reckless and that the risk of death resulting from that recklessness was only possible. We therefore conclude that the jury was properly instructed on the reckless manslaughter charge.
We have also examined the entire charge to determine if the jury was properly instructed on the difference between aggravated manslaughter and reckless manslaughter. Although the charge was not "a paragon of clarity," State v. Masino, 94 N.J. 436, 477 (1983), we are satisfied that the charge as a whole properly instructed the jury on the difference between aggravated manslaughter and reckless manslaughter. Although the trial judge did not instruct on the difference in terms of "probabilities," he made clear that the difference was the degree of the recklessness. Both the words used and the *367 illustration given pointed out that the degree of recklessness in aggravated manslaughter was significantly greater than the degree of recklessness in reckless manslaughter. The instruction informed the jury that defendant could be convicted of first degree manslaughter only if defendant's recklessness toward Mrs. Podgis was such that the defendant did not care whether she lived or died. Recklessness which must be so extreme as to demonstrate an indifference to human life or is so indifferent to human life that the actor does not care whether the victim lives or dies is a degree of recklessness which is functionally equivalent to a high probability that the actor's conduct would cause the death of Mrs. Podgis. Given this understanding of the charges on reckless and aggravated manslaughter, we are completely satisfied that the evidence sufficiently established defendant's guilt on aggravated manslaughter in view of all the circumstances.

III
We next consider whether the statute as interpreted by us is unconstitutionally vague or overbroad. As we have interpreted N.J.S.A. 2C:11-4, it gives a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may conform his acts to the law. Town Tobacconist v. Kimmelman, 94 N.J. 85, 118 (1983). Simply because the prohibited behaviour is not susceptible to precise definition need not lead to legislative paralysis. State v. Lee, 96 N.J. 156, 165 (1984). Based on our interpretation, we are satisfied that the statute is not constitutionally vague.
The contention that the statute is overbroad posts the question of whether the reach of the law extends too far in fulfilling the State's interest. Town Tobacconist v. Kimmelman, 94 N.J. at 125 n. 21. Generally, overbreadth arguments relate to first amendment rights which are not involved here. In re Hinds, 90 N.J. 604, 617-619 (1982). Moreover, the statute in question does not reach any constitutionally protected conduct.

*368 IV
Defendant further contends that a directed verdict of acquittal should have been granted on the murder charge. He contends that the evidence was insufficient to submit the charge of murder to the jury. We disagree. When Scott Franz left the living room to go upstairs to take a shower, Mrs. Podgis was in the kitchen preparing french toast for breakfast. Up to that point there had been no discussion between Scott Franz and defendant about causing any possible harm to Mrs. Podgis. On the contrary, her role had been that of a loving mother who wanted to make peace and harmony between her husband and her son Scott Franz. The evidence in its totality permitted the jury to infer that defendant knowingly or purposely shot Mrs. Podgis in the abdomen. The autopsy revealed she was shot from a distance of two to three feet. The autopsy also revealed antemortem bruising of her scalp in the left frontal area, left temporal region and left occipatal area. Those injuries were caused by three blunt impacts to her head. Moreover, Franz heard the shot fired downstairs about sixteen seconds after Franz shot Mr. Podgis upstairs. Franz came downstairs and found defendant standing in the living room with the rifle in his hand. Defendant said "What are we going to do?" When Scott Franz asked defendant what happened, defendant responded "I shot your mother."
Additionally, the jury was free to determine from the evidence that defendant deliberately armed the rifle by the lever action to prepare it for firing. We are therefore satisfied that the evidence was sufficient to permit submission of the charge of murder to the jury. State v. Reyes, 50 N.J. 454 (1967); R. 3:18-1.

V
Defendant further contends that the court erred in not charging the jury on negligent homicide or the meaning of an *369 accidental killing. The history of the Criminal Code makes clear that the judge was not required to charge negligent homicide. As originally proposed, the Criminal Code contained a crime designated as negligent homicide. (See the proposed 1971 Code, Vol. I, § 2C:11-5). Instead of adopting negligent homicide, causing death by auto was enacted as N.J.S.A. 2C:11-5 after certain modifications. Consequently, the judge properly refused to instruct the jury on a nonexistent crime. This is so irrespective of whether the negligence is designated as ordinary negligence or gross negligence.
Defendant further contends that the court erred in not defining an accidental killing. We disagree. The trial judge gave the normal instruction that defendant is presumed innocent and that the burden of proof is on the State throughout the trial. The jury was told that if the killing of Mrs. Podgis did not come within the court's instructions on murder, aggravated manslaughter or reckless manslaughter, defendant must then be acquitted. The jury was further instructed that if the killing of Mrs. Podgis was accidental, obviously meaning that if the killing was not murder, aggravated manslaughter or reckless manslaughter, then defendant must be acquitted. Furthermore, the jury was told that if the contention that the shooting was accidental caused the jury to have a reasonable doubt then the only verdict would be not guilty.
The identical argument was advanced and rejected in State v. Reyes, 50 N.J. at 464-465. The observations of our Supreme Court are germane here. It stated
Defendant's requests to charge on the subject of misadventure were designed to call to the special attention of the jury that if the decedent had been shot accidentally, he should be found not guilty.... We do not see how defendant suffered any "wrong or injury" thereby. R.R. 1:5-1(a). It is evident to us that the jury could not fail to realize, without any specific instruction on the subject, that if it should believe defendant's tale of an accidental shooting, it was bound to return a not guilty verdict. It knew this was the defense and the contention had been fully discussed in the summations. Moreover, the court did instruct that, in order for the jury to find defendant guilty of any of the offenses specified, the State had to prove beyond a reasonable doubt all of the essential elements thereof, which were spelled out in detail. It would be obvious to the *370 jury that "accident" was the exact opposite of these necessary elements. In addition, the court said that the verdict would be not guilty if the State had not proved its charge beyond a reasonable doubt. All of this was adequate under the circumstances.

VI
We find defendant's contention that the prosecutor's comments during summation infringed upon his constitutional right of silence is clearly devoid of merit. The prosecutor stated that "[M]aybe all of the facts, all the true facts in this case have not come out." When ruling on the objection to the comment, the trial judge stated emphatically that he did not regard the comment to be related to defendant's election not to testify. We agree with the trial judge's perception since he had a real feel of the case. We have no doubt that the prosecutor was referring to the discrepancies in the testimony of Scott Franz, a key witness for the State, when compared to the testimony of other witnesses such as Dr. Halbert Fillinger who performed the autopsies on both Alfred and Rosemary Podgis. Scott Franz testified that Alfred Podgis took about three shots at him on Monday morning. Ballistic tests showed the rifle that fired the shot into the wall was the same rifle used to kill Alfred Podgis. Also, the rifle was directed upward and was touching the victim's head when fired rather than being fired downward from some distance as testified to by Franz. Consequently, the prosecutor's comments were entirely proper comments on the evidence in the case.
We also reject defendant's contention that the prosecutor had to vouch for the credibility of the witnesses he called. See State v. Ross, 80 N.J. 239, 252-253 (1979). We find no indication that the prosecutor knowingly produced fabricated or falsified evidence. The prosecutor was duty bound to present evidence that would assist the jury in ascertaining the truth.
*371 Defendant also contends that the sentence is excessive. We disagree. Aggravated manslaughter is a crime of the first degree which carries a maximum ordinary sentence of 20 years. N.J.S.A. 2C:43-6a.(1). There is a presumption of incarceration for first degree crimes. N.J.S.A. 2C:44-1d. The presumptive sentence for a first degree crime is 15 years. N.J.S.A. 2C:44-1f. Where the aggravating factors, however, outweigh the mitigating factors found in N.J.S.A. 2C:44-1a. and b., a sentence greater than the presumptive sentence may be imposed. We are satisfied from our independent study of the record that aggravating factors were established under N.J.S.A. 2C:44-1a.(1)(2) and (9). The mitigating factors were established under N.J.S.A. 2C:44-1b.(7)(8) and possibly (10). But more than a quantitative analysis of the aggravating and mitigating factors is required. "The factors are not interchangeable on a one-to-one basis. The proper weight to be given to each is a function of its gravity in relation to the severity of the offense." State v. Roth, 95 N.J. 334, 368 (1984). The sentence for "a crime must reflect primarily the severity of that crime." State v. Hodge, 95 N.J. 369, 377 (1984). We are satisfied from our study of the record that the mitigating factors do not outweigh the severity of the crime and the character of defendant that was also reflected in his efforts to dispose of the body. All of the mitigating factors pale in comparison to the gravity of the offense.
We have also considered defendant's contention that the parole ineligibility is excessive. We disagree. Since this was a Graves Act offense, the 10 years of parole ineligibility is imposable without reference to aggravating and mitigating factors. N.J.S.A. 2C:43-6c. Moreover, for reasons stated in the preceding paragraph, the term of parole ineligibility is not improper under N.J.S.A. 2C:43-6b. Consequently, we hold that the sentence is in accordance with the sentencing guidelines, *372 and it is neither unreasonable nor shocking to the judicial conscience. State v. Roth, 95 N.J. 334 (1984); State v. Hodge, 95 N.J. 369 (1984).
Finally, defendant contends that "it was error to charge flight" and that "the plea agreement and the charge of the court regarding accomplice/plea agreement, was improper and prejudiced the rights of the defendant." We have carefully considered these and all other remaining contentions and the arguments advanced in support of them and find they are clearly without merit. R. 2:11-3(e)(2). We add simply that defendant's conduct in disposing of the bodies and then fleeing to Texas created factual circumstances which clearly warranted a charge of flight. State v. Centalonza, 18 N.J. Super. 154, 161 (App.Div. 1952).
The judgment of conviction is accordingly affirmed. The State's cross-appeal on an evidentiary ruling is dismissed in light of our affirmance.