781 A.2d 1086 (2001)
344 N.J. Super. 297
STATE of New Jersey, Plaintiff-Respondent,
v.
Lazaro PIGUEIRAS, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 26, 2001.
Decided October 10, 2001.
*1087 J. Michael Blake, Assistant Deputy Public Defender, argued the cause for appellant *1088 (Peter A. Garcia, Acting Public Defender, attorney; Mr. Blake, of counsel and on the brief).
Deborah Bartolomey, Deputy Attorney General, argued the cause for respondent (John J. Farmer, Jr., Attorney General of New Jersey, attorney; Ms. Bartolomey, of counsel and on the brief).
Before Judges CONLEY, A.A. RODRÍGUEZ and LEFELT.
The opinion of the court was delivered by CONLEY, J.A.D.
Driving while intoxicated, defendant lost control of his car. The resulting one-car accident caused severe and permanent injuries to his girlfriend. Following a jury trial, defendant was convicted of seconddegree aggravated assault and forth-degree assault by auto, along with several motor vehicle adjudications made by the trial judge following the jury verdict. An aggregate term of nine years with a threeyear parole disqualifier was imposed, along with the necessary fines and penalties.
On appeal, defendant contends:
POINT I THE INSTRUCTIONAL ERRORS IN THIS CASE, ALONE OR IN COMBINATION, DEPRIVED THE JURY OF PROPER GUIDANCE AND THE DEFENDANT OF DUE PROCESS OF LAW AND THE RIGHT OF A FAIR TRIAL. U.S. CONST. AMEND. XIV; N.J. CONST.,ART. I, ¶ ¶ 1, 9, 10.
A. THE FAILURE TO ADEQUATELY DEFINE THE DEGREE OF RECKLESSNESS REQUIRED FOR AN AGGRAVATED ASSAULT CONVICTION REQUIRES REVERSAL OF THAT CONVICTION.
B. THE COURT'S FAILURE TO EXPLAIN THE DIFFERENCE BETWEEN THE RECKLESSNESS AND NEGLIGENCE OR CARELESSNESS AS REQUESTED BY THE DEFENSE REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS FOR BOTH AGGRAVATED ASSAULT AND ASSAULT BY AUTO.
C. THE COURT'S FLAWED AND INCOMPLETE INSTRUCTIONS CONCERNING THE LESSER INCLUDED MOTOR VEHICLE OFFENSE, DRIVING WHILE INTOXICATED AND RECKLESS DRIVING, WERE CONTRARY TO STATE V. MUNIZ AND DENIED DEFENDANT A FAIR TRIAL AS DID THE COURT'S FAILURE TO CHARGE CARELESS DRIVING AS A LESSER-INCLUDED OFFENSE.
D. THE TRIAL COURT'S REFUSAL TO INSTRUCT THE JURY AS TO HOW EVIDENCE OF INTOXICATION RELATED TO RECKLESSNESS AND TO MANIFEST EXTREME INDIFFERENCE TO THE VALUE OF HUMAN LIFE DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL.
E. THE TRIAL COURT'S REFUSAL TO INSTRUCT THE JURY THAT ASSAULT BY AUTO WAS A LESSER-INCLUDED OFFENSE OF AGGRAVATED ASSAULT DENIED DEFENDANT OF A FAIR TRIAL AND DUE PROCESS OF LAW.
POINT II THE COURT ABUSED ITS DISCRETION AND DENIED DEFENDANT DUE PROCESS OF LAW IN ADMITTING UNRELIABLE TESTIMONY CONCERNING THE *1089 RESULTS OF AN ALLEGED SCIENTIFIC TEST IN THE ABSENCE OF A SUFFICIENT FOUNDATION CONCERNING THAT TEST. (U.S. CONST. AMEND. XIV); N.J. CONST. (1947) ART. I, PARA. 1 (Partially Raised Below).
POINT III PROSECUTORIAL MISCONDUCT DEPRIVED THE DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL. U.S. CONST. AMEND. 16, N.J. CONST. ART. 7 PAR. 10 (Partially Raised Below).
A. THE PROSECUTOR'S REFERENCE TO EXCLUDED TESTIMONY WAS IMPROPER.
B. PROSECUTOR'S REPEATED CHARACTERIZATION OF DEFENDANT AS A LIAR WAS IMPROPER
C. THE PROSECUTOR'S ATTEMPT TO INFLAME THE JURY BY SOLICITING SYMPATHY FOR THE VICTIM AND ANTIPATHY TOWARDS MR. PIGUEIRAS WAS IMPROPER.
POINT IV THE TRIAL COURT IMPOSED A CLEARLY EXCESSIVE SENTENCE.
We have considered these contentions in light of the record and applicable law. Point IC and E, Point III, and Point IV are of insufficient merit to warrant further comment. R. 2:11 3(e)(2).
We address Point II briefly. Defendant contends the State's reconstruction expert's opinion that defendant had a speed loss or reduction in speed of 43 m.p.h. as a result of skidding for a distance of seventy-three feet was based upon a scientific methodology using a "drag sled," which was not shown to be reliable and that its introduction into evidence was reversible error. We reject this contention. Defendant, who had the expert's report long before trial and knew of the 43 m.p.h. speed loss theory, not only did not object on the basis he now raises before us but told the judge "[i]t's properly before the court." Had he done so, the State would have been afforded the opportunity to establish the reliability of the "drag sled" test. We are told by the State in its brief:
The drag-sled test consists of dragging part of a concrete-filled tire over the road surface to measure the coefficient of friction. See Fricke & Baker, Drag Factor and Coefficient of Friction in Traffic Accident Reconstruction, Exhibits 13 and 14 and accompanying text (Northwestern University Traffic Institute), pp. 62-11 to 62-13 (Pa10 to 12). It is hardly a "high technology venture." See Seeing is Believing, Or Is It? An Empirical Study of Computer Simulations as Evidence, 34 Wake Forest L.Rev., 257, 294 n. 100 (Summer 1999). It is, rather, a fairly simple process, and because it is not a highly technical method there is not a high degree of proof of reliability necessary. State v. Haskins, 131 N.J. [643,] 650, 622 A.2d 867 [(1993) ]. The reliability of the device, had defendant sought to challenge it, would have needed only to be "clearly established." Id. Certainly that could easily be done by pointing out the inclusion of the drag sled in the accident reconstruction manual published by the long-established leader in the field....
Defendant has not shown any defect in the formula used by Officer Rentas to calculate defendant's speed loss over the course of the skid. Nor could he. This is a principle of basic physics known as the coefficient of friction, commonly used to estimate speed. The scientific reliability of determinations of speed using principles of physics is well accepted by experts. See Expert Testimony Regarding *1090 the Speed of a Vehicle: The Status of North Carolina Law and the State of the Art, 16 Campbell L.Rev. 191, 199-203 (Spring 1994).
Moreover, even if erroneously admitted, the harm is slight. Defendant argues the evidence allowed the jury to infer that his speed before the initial impact must have been very excessive and, thus, formed a basis for the jury's finding of "extreme indifference to human life" necessary to convict him of the second degree aggravated assault charge. We are convinced, however, the jury did not need the speed reduction evidence to conclude defendant's speed was egregiously excessive under the circumstances. Indeed, defendant conceded during the trial that he was going 65 to 70 m.p.h. before impact.
We address the remainder of defendant's contentions in more detail. We conclude they do not require a reversal of the convictions.

I.

Facts
On May 29, 1994, Eunice Roman and defendant attended a wedding reception at the Wayne Manor Banquet Hall in Wayne Township. Sometime shortly after midnight, the couple left the reception in defendant's 1989 Lincoln Town Car, heading south on Route 23. Defendant was intending to exit onto Route 80. After driving approximately three miles, they approached the Route 80 off-ramp. In a statement taken shortly after the accident, defendant said he was going 55 or 60 m.p.h. At trial he said his speed was 65 or 70 m.p.h. The area is a 55 m.p.h. zone. He hit the curb on the front driver's side of the vehicle, and then hit two attenuators, or sand-filled crash barrels, with the front, passenger side of the vehicle. The vehicle skidded for seventy-three feet, slammed into a guardrail, spun around counterclockwise, and slide off the road, down a ravine, passenger side first. The ravine was about fifteen or twenty feet down. The vehicle traveled over two small trees, which bent with the weight, becoming uprooted and creating a ramp-like effect, propelling the vehicle upward. The vehicle rolled over and landed at sufficient speed to vault into the air again, after which it landed in a "mangled hunk of black steel" heap, 128 feet away from where it exited the roadway. Ms. Roman was ejected from the passenger side window landing approximately thirty-four feet from where the vehicle finally came to rest. Defendant was also ejected from the car, landing about five feet from the vehicle.
The State's expert was not permitted to estimate the speed at which defendant was traveling when the accident occurred, but he was allowed to testify that if defendant was traveling at 55 or 60 m.p.h., he would have been traveling at only 11 to 16 m.p.h. when the car struck the guardrail, and that was unlikely because of what occurred thereafter. Indeed, as we have said, defendant testified during the trial that his speed prior to impact was 65 to 70 m.p.h.
Ms. Roman's injures were extensive. Her jaw was broken and split in two. She had several broken ribs, a broken clavicle, a collapsed lung and injury to her right hand and leg. By the time of trial she had not regained full use of her hand or leg. Her most devastating injury was to her brain stem. She remained in intensive care for two-and-a-half months and was comatose for seven-and-one-half months. Although she emerged from the coma, she had to relearn the most basic skills, including eating, speaking, and ambulation, and ultimately was transferred to the Kessler Institute for rehabilitation. She has suffered damage to her cognitive abilities, as well as partial amnesia. Ms. Roman does not remember the wedding, the accident, *1091 or even the defendant, with whom she had lived and was engaged to be married. At the time of trial, five years after the accident, Ms. Roman had returned home to live with her mother. She had difficulty with her vision, was wheelchair-bound and wore a corrective brace on her right leg.
As we have said, prior to the accident, defendant and Ms. Roman were attending a wedding reception. They had arrived at approximately 7 p.m., while cocktail hour was underway. There was an open bar. There was dispute as to how much defendant drank and how intoxicated he became. Defendant testified that he ate heartily and did not drink during the cocktail hour. One of Ms. Roman's coworkers, also attending, testified he did imbibe during the cocktail hour.
At eight o'clock, the affair moved into the main reception room. The dinner and dancing lasted from 8:30 p.m. until 12 midnight. Defendant testified he had about four drinks, pina coladas and rum and cokes. A coworker testified that the defendant went up to the bar at least five or six times and offered the other guests at their table drinks several times, reminding them the drinks were on the house. Another coworker said defendant had more than one drink at the reception, but she did not know how many. Yet another attendee said she saw him with two or three drinks at the reception. The bride did not know how much alcohol defendant had drunk. Defendant was described as being loud and obnoxious. He danced by himself "like a monkey," "crazy," "like a stripper," and "maniac." In his police statements, defendant admitted to three drinks. His blood alcohol level shortly after the accident was .138 which, under the particular circumstances, the State's expert opined would have required consumption of at least 8.28 drinks.
In any event, Ms. Roman and defendant left around midnight. The circumstances leading to Ms. Roman's presence in defendant's car at the time of the accident are disputed. According to defendant, he initially wanted to go to a dance club with the others in their group. Ms. Roman, however, did not wish to continue partying. So they left without incident.
Witnesses for the State testified to the events in the parking lot quite differently. According to them, Ms. Roman and defendant had had some disputes during the reception and did not leave the building together because Ms. Roman did not want to go home with defendant. According to the State's witnesses, Ms. Roman got into a coworker's car. Defendant approached the car looking for her and began pounding on its hood. To avoid a scene, Ms. Roman got out of the car and got into the driver's seat of defendant's Lincoln. The witnesses testified that defendant pushed her into the passenger seat, got behind the wheel and "peeled" out of the parking lot at a high rate of speed.
One of the coworkers was heading in the same direction as defendant and followed behind his car on the roadway. She testified that they were driving fast and that after she saw him swerving between lanes, she slowed down to 65 m.p.h. to avoid an accident. She stated that his car quickly sped ahead out of her sight. Even though she increased the speed of her car to 70 m.p.h., she did not thereafter see his car. She did notice a cloud of smoke beside the road as she drove home, however, she did not realize that that was the site of the accident. It was her lay opinion that defendant was driving 80 or 85 m.p.h.
Defendant described what occurred as an unfortunate accident involving no more than carelessness or negligence on his part. He explained that in the area of the exit ramp for Route 80, which he was planning to take, Route 23 is a three-lane highway and that the road configuration is *1092 confusing. There are no street lights; the off-ramp is marked only by over-hanging signs illuminated by lights shining on the signs. Defendant said the road was dark in the off-ramp area and he was not familiar with the area. He wanted to get onto Route 80 east. He admitted he was going too fast for the area and that his speed was 65 to 70 m.p.h. He could not negotiate the turn for the exit, losing control of the car.

II.

Adequacy of the Jury Charge on the Degree of Recklessness Required for Aggravated Assault
Defendant argues in Point IA that the degree of recklessness required for a conviction for aggravated assault is qualitatively and quantitatively greater than that required for assault by auto and that the trial court committed reversible error by refusing to so inform the jury. He relies upon State v. Jiminez, 257 N.J.Super. 567, 608 A.2d 996 (App.Div.1992), and its progeny which require a differentiated jury charge where a defendant has been charged with both reckless manslaughter and death by auto. We agree that the degree of recklessness is greater for aggravated assault than for assault by auto, but we are satisfied that the charge given the jury was sufficient to convey that difference.
In Jiminez, supra, we upheld a charge on aggravated manslaughter that parallels the charge given here. That charge defined "recklessness" in terms of the standard definition contained in N.J.S.A. 2C:2-2(b)(3)[1] and explained that "extreme indifference to human life," meant probability of death rather than possibility, 257 N.J.Super. at 577-78, 577 n. 1, 608 A.2d 996. See State v. Kotter, 271 N.J.Super. 214, 227, 638 A.2d 825 (App.Div.), certif. denied, 137 N.J. 313, 645 A.2d 141 (1994); State v. Curtis, 195 N.J.Super. 354, 363-64, 479 A.2d 425 (App.Div.), certif. denied, 99 N.J. 212, 491 A.2d 708 (1984). We concluded, however, that the instructions on reckless manslaughter and death by auto were not sufficient because they did not differentiate between the type of recklessness the State must prove for reckless manslaughter and the type of recklessness it must prove for death by auto. Jiminez, 257 N.J.Super. at 581, 608 A.2d 996. We said it was:
obvious that the distinction between the recklessness required for aggravated manslaughter and that necessary for reckless manslaughter is clear because of the addition in the aggravated manslaughter section of the language "under circumstances manifesting extreme indifference to human life".... The more difficult question is whether the jury was appropriately apprised of the quantitatively greater recklessness contemplated for manslaughter than that required for death by auto....

Id. at 581-82, 608 A.2d 996.]
Since the jury instructions on the reckless manslaughter and death by auto simply repeated the same recklessness definition, we determined that was not sufficient to inform the jury of the differences between those two offenses. We so concluded in *1093 the context of an amendment to the Criminal Code which permits an indictment and conviction on both reckless manslaughter and death by auto where a motor vehicle is involved. N.J.S.A. 2C:11-5d. We said:
the adoption of paragraph d as a supplement to N.J.S.A. 2C:11-5 requires the trial judge to craft a charge to a lay jury explaining the subtle and sophisticated distinctions between the concept of recklessness envisioned by the Legislature in death by auto as distinguished from the recklessness envisioned in the manslaughter statute. It is obvious that the initial charge, as well as the two supplemental charges given by the trial judge in this case, do not even begin to explain the quantitative difference between the recklessness required for reckless manslaughter and that required for death by auto. By way of example we offer the following language as suggestive of an explanation of that quantitative difference that might be given:
Let me differentiate between the reckless manslaughter statute and the death by auto statute. Standing alone, the reckless driving of an automobile which results in the death of another satisfies all of the requirements for violation of the death by auto statute provided you are so convinced beyond a reasonable doubt.
A reckless manslaughter conviction, on the other hand, must be based upon proof beyond a reasonable doubt that the defendant engaged in additional acts of recklessness beyond the mere driving of an automobile in a reckless manner and that these additional acts of recklessness were also a cause of the victim's death. That is, causative acts of recklessness different in kind from, although not necessarily worse than, that involved in reckless driving. These additional acts of recklessness must be conduct of the defendant in addition to the recklessness in his operation of the brown Pontiac which allegedly resulted in the deaths of Michael Rosario and Alexander Nozario. This is not to say that someone guilty of reckless manslaughter may not have been driving recklessly as well, so as to satisfy the requirements of death by auto, but to find a person guilty of reckless manslaughter where an automobile is involved, there must be acts of recklessness separate and apart from and in addition to the manner of driving the automobile, and these acts must have been a cause of the person's death.

[257 N.J.Super. at 583-84, 608 A.2d 
996 (footnoted omitted).]
The language we proffered concerns solely the reckless manslaughter and death by auto offenses, not the aggravated manslaughter offense.
We have continued to recognize the need to differentiate the degree of recklessness required for reckless manslaughter and death by auto as expressed by State v. Jiminez. See State v. Lane, 288 N.J.Super. 1, 9, 11, 671 A.2d 1045 (App.Div.1995); State v. Scher, 278 N.J.Super. 249, 268-69, 650 A.2d 1012 (App.Div.1994), certif. denied, 140 N.J. 276, 658 A.2d 299 (1995). So too has the Supreme Court:
The recklessness required for manslaughter is not the same as that required for death by auto. For reckless manslaughter, the State must prove beyond a reasonable doubt causative acts of recklessness that are different in kind from the acts involved in reckless driving that support a conviction for death by auto.... Those additional acts of recklessness must also contribute to causing the death of the victim.

[State v. Jamerson, 153 N.J. 318, 334-35, 708 A.2d 1183 (1998).]
In the present case, the trial judge instructed the jury first on the charge of aggravated assault. As to the State's burden *1094 on the recklessness element of that offense, the judge explained that the State must prove:
that the defendant acted recklessly, under circumstances manifesting extreme indifference to the value of human life.
....
[T]he second element that the State must prove beyond a reasonable doubt is that the defendant acted recklessly, under circumstances manifesting extreme indifference to the value of human life.
[U]nder our law, a person acts recklessly with respect to the results of his conduct if he consciously disregards a substantial risk and unjustifiable risk that the result will occur from his conduct. The risk must be of such a nature and degree that considering the nature and purpose of the actor's conduct and the circumstances known to the actor, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.
One is said to act recklessly if one acts with recklessness, with scorn for the consequences, heedlessly, or foolhardy.
[T]he phrase, under circumstances manifesting extreme indifference to the value of human life, does not focus on the state of mind of the actor; but, rather, on the circumstances under which you find that he acted.
If in light of all the evidence, you find that the conduct of the defendant resulted in a probability as opposed to a mere possibility of serious bodily injury, then you may find that he acted under circumstances manifesting extreme indifference to the value of human life.
[I]n determining whether the defendant acted recklessly, under circumstances manifesting extreme indifference to the value of human life, you may consider the nature of the acts itself and the severity of any resulting injury.
As to the assault by auto charge, the judge instructed:
[I]n order to find the defendant guilty of assault by auto, the State must prove beyond a reasonable doubt each of the following elements:
First, that the defendant operated a vehicle recklessly; and second, that said reckless operation caused either serious bodily injury or injury to another.
[W]ith respect to the first element, that the defendant operated a vehicle recklessly, the term "vehicle" includes an automobile.
[W]ith respect to recklessness ... a person acts recklessly with respect to a material element of an offense, when a person consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree, that considering the nature and purpose of the actor's conduct and the circumstances known to the actor, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. One is said to act recklessly if one acts with recklessness, with scorn for the consequences, heedlessly, or foolhardy.
Although the judge did not reemphasize that the recklessness for assault by auto did not include the additional element of "circumstances manifesting extreme indifference to human life" or explain that the assault by auto recklessness was a possibility of injury whereas the aggravated assault recklessness was a probability of injury, that is obvious from the language of the separate instructions.
Moreover, the jury's concern here was upon aggravated assault only. It first requested a read back of the elements of that offense, including, specifically the "extreme indifference to human life" aspect of *1095 the recklessness required. The judge redefined the term, instructing:
The phrase, under circumstances manifesting extreme indifference to the value of human life, does not focus on the state of mind of the actor; but rather, on the circumstances under which you find he acted. If, in light of all of the evidence, you find that the conduct of the defendant resulted in a probability as opposed to a mere possibility of serious bodily injury, then you may find that he acted under circumstances manifesting extreme indifference to the value of human life.
In determining whether the defendant acted recklessly, under circumstances manifesting extreme indifference to human life, you may consider the nature of the acts itself and the severity of the resulting injury.
Thereafter, the jury again requested that the judge re-read or define "under circumstances manifesting extreme indifference to the value of human life." To which the judge said:
The phrase, under circumstances manifesting extreme indifference to the value of human life, does not focus on the state of mind of the actor; but rather, on the circumstances under which you find that he acted. If, in light of the all the evidence, you find that the conduct of the defendant resulted in a probability as opposed to a mere possibility of serious bodily injury, then you may find that he acted under circumstances manifesting extreme indifference to the value of human life. In determining whether the defendant acted recklessly, under circumstances manifesting extreme indifference to human life, you may consider the nature of the act itself and the severity of the resulting injuries.
After further deliberations, the jury requested a read-back for the entire aggravated assault charge. After redacting certain irrelevant portions, the charge was re-read and a written copy of it given to the jury. The instructions on "recklessness" and "under circumstances manifesting extreme indifferent to human life" were included.
A comparison of the statutory language is helpful in understanding the difference between this case and the reckless manslaughter/death by auto cases. Death by auto, N.J.S.A. 2C:11-5, a second-degree offense, provides, in part:
Death by auto or vessel. a. Criminal homicide constitutes vehicular homicide when it is caused by driving a vehicle or vessel recklessly.
Assault by auto, N.J.S.A. 2C:12-1(c), a forth-degree offense, provides, in part:
c. (1) A person is guilty of assault by auto or vessel when the person drives a vehicle or vessel recklessly and causes either serious bodily injury or bodily injury to another.
Aggravated manslaughter, N.J.S.A. 2C:11-4(a), a first-degree offense, provides, in part:
a. Criminal homicide constitutes aggravated manslaughter when the actor recklessly causes death under circumstances manifesting extreme indifference to human life.
Reckless manslaughter, N.J.S.A. 2C:11-4(b)(1), a second-degree offense, provides, in part:
b. Criminal homicide constitutes manslaughter when:
(1) It is committed recklessly. ... Aggravated assault, N.J.S.A. 2C:12-1(b)(1), a second-degree offense, provides, in part:
b. Aggravated assault. A person is guilty of aggravated assault if he:
(1) Attempts to cause serious bodily injury to another, or causes such injury purposely or knowingly or under circumstances manifesting extreme *1096 indifference to the value of human life recklessly causes such injury....
[Emphasis added.]
Thus, assault by auto, death by auto, and reckless manslaughter all contain the element of "recklessness." Both aggravated manslaughter and aggravated assault, on the other hand, require a degree of recklessness that demonstrates "extreme indifference to the value of human life."
There is no case law expressly addressing the question of whether assault by auto and aggravated assault necessitate the type of instructions deemed necessary in the reckless manslaughter/death by auto cases. An understanding of why we have recognized that need in the latter, however, reveals that such a specific instruction is not called for here.
As we have already said, in State v. Jiminez, we affirmed the charge for aggravated manslaughter, which, like aggravated assault, explains the additional element of extreme indifference for human life by instructing that the circumstances must involve a probability not just a possibility. 257 N.J.Super. at 577-78, 577 n. 1, 608 A.2d 996. However, because reckless manslaughter and death by auto both require only recklessness, we concluded the charge as to each must explain the distinction between the two. Id. at 580-81, 608 A.2d 996. We said it was "obvious that the distinction between the recklessness required for aggravated manslaughter and that for reckless manslaughter is clear because of the addition in the aggravated manslaughter section of the language `under circumstances manifesting extreme indifference to human life.'" Id. at 581, 608 A.2d 996. That was not so with the explanation of the recklessness for death by auto and reckless manslaughter. See State v. Jamerson, 153 N.J. at 334, 708 A.2d 1183. Thus, when there is one offense with recklessness only and another with recklessness heightened by extreme indifference, the distinction is clear. On the other hand, where there are two offenses each with recklessness alone and a quantitative difference is required, the jury must be given sufficient instructions as to those additional acts which would make clear the quantitative distinction.
In this case, the trial judge's instruction on aggravated assault was similar to the instruction we found acceptable for aggravated manslaughter in Jiminez. Included in the instructions was the explanation of what circumstances manifesting extreme indifference to human life meant. That is to say, the judge instructed the jury to consider whether the defendant's conduct resulted in a probability as opposed to the mere possibility of serious bodily injury, thereby manifesting extreme indifference to human life.
For the assault by auto charge, the trial court read the statute, listed the elements, defined recklessness, and defined serious and bodily injury. While the trial court did not tell the jury these two offenses had a qualitative difference in the recklessness required, that was evident from the additional element of "extreme indifference to the value of human life" charged on the aggravated assault offense. We are convinced the jury understood the differences between the two offenses and understood that the degree of recklessness was "significantly higher" for an aggravated assault. Cf. State v. Curtis, supra, 195 N.J.Super. at 366-67, 479 A.2d 425. See State v. Kotter, supra, 271 N.J.Super. at 227, 638 A.2d 825. Nothing more was required.

III.

Failure to Explain Difference Between "Recklessness" and "Negligence" or "Carelessness"
During the charge conference, the defendant requested that the judge define *1097 negligent in the jury charge, because "the defendant's position here will be with this jury that this defendant was, in fact, [merely] negligent." The judge declined to charge mental states that were not an element of the offenses charged because of the danger of confusing the jury. He told defendant that he could argue mere negligence in his closing. Unless the jury asked for further instruction on recklessness, he would not charge other mental states. The trial judge reasoned that if the jury did not think the defendant's mental state was reckless, they would simply not convict. If the jury was confused the judge would clarify. The trial judge rejected defendant's contention that State v. Concepcion, 111 N.J. 373, 545 A.2d 119 (1988), required the court to charge on the defendant's theory.
In Point IB defendant renews his contention here, again relying on Concepcion. He argues that because the jury asked for recharge several times, the judge should have clarified "recklessly" with comparisons to "purposefully," "knowingly," and "negligently."
We disagree. To begin with, the jury's questions were focused upon the "extreme indifference to human life" aspect of the aggravated assault offense, not upon the mere recklessness required for the assault by auto offense. Negligence or carelessness was, evidently, not in the picture. Moreover, Concepcion is inapposite.
In State v. Concepcion, defendant, who was convicted of reckless manslaughter, left a loaded handgun in his apartment, and after returning later that evening with guests, a victim was shot and killed. 111 N.J. at 375, 545 A.2d 119. Defendant claimed an accidental shooting. The reckless manslaughter charge tracked the model jury charge and included the following instructions as to the element of recklessness:
[Y]ou must find that the defendant was aware of and consciously disregarded a substantial and unjustifiable risk that death would result from his conduct. The risk must be of such a nature and degree that considering the nature and purpose of the defendant's conduct and the circumstances known to him, his disregard of that risk is a gross deviation from the standard of conduct that a reasonable person would follow in the same situation. In other words, you must find that the defendant was aware of and consciously disregarded the risk or possibility of causing death.
....
You will have to determine whether in light of all the circumstances, its presence in the defendant's home created or presented a substantial and unjustifiable risk which the defendant was aware of and consciously disregarded. If you are not satisfied beyond a reasonable doubt that the defendant did both in fact cause the death of Jacqueline Jones and did act recklessly in causing that death, then you must find the defendant not guilty....

[Id. at 378, 545 A.2d 119.]
After deliberation, "the jury asked the court for a clarification of the definition of recklessness," and the "court limited its recharge to a repetition of the statutory definition of manslaughter." Ibid. In reversing the reckless manslaughter conviction, the Supreme Court noted that "it is not always enough simply to read the applicable provision of the Criminal Code, define the terminology, and set forth the elements of the crime.... Ordinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case." Id. at 379, 545 A.2d 119. Under the circumstances of that case, the Court thought the better practice would *1098 have been for the trial judge to explain to the jury that it had to make a preliminary finding as to what happened that night and based on that finding, "the jury should have been told to measure all of the defendant's relevant conduct against the legal standard for reckless manslaughter." Id. at 380, 545 A.2d 119. The trial court inadequately guided the jury because he mentioned only leaving the loaded gun on his bookshelf; he did not mention "leaving the gun on the bookcase, bringing a group of people into his apartment, allowing them into the living room although a loaded gun was there, and the manner in which he handled the gun, i.e., the way he tried to wrestle it from the victim...." Id. at 380, 545 A.2d 119. As the following reflects, the Supreme Court's primary concern was in the selectiveness of the judge's recitation of the facts, a recitation the Court thought helpful given the particular circumstances:
In this case, it would have been helpful for the trial court to have explained to the jury that it had to make a preliminary finding concerning what occurred in defendant's living room on the night of the shooting. Then based on that finding, the jury should have been told to measure all of defendant's relevant conduct against the legal standard for reckless manslaughter. Therefore, the jury should have been instructed to evaluate the state of mind defendant possessed throughout the entire sequence of relevant events, which included leaving the gun on the bookcase, bringing a group of people into his apartment, allowing them into the living room although a loaded gun was there, and the manner in which he handled the gun, i.e., the way he tried to wrestle it from the victim before the victim was shot.
The trial court was too selective in mentioning only defendant's conduct in leaving the loaded gun on the bookshelf. The jury heard extended testimony concerning the firearms training defendant had received in connection with his efforts to become a special police officer. This, in conjunction with the court's instruction that the jury had to determine "whether in light of all the circumstances, [the gun's] presence in defendant's home created or presented a substantial and unjustifiable risk which the defendant was aware of and consciously disregarded," incorrectly narrowed the focus of the jury's attention. The defendant's version of the facts, if believed by the jury, attributed the shooting to the unintentional discharge of the weapon as defendant wrestled the gun from the victim. Nevertheless, in attempting to explain its charge to the jury in the context of the testimony, the trial court omitted any mention of defendant's attempt to regain control of the weapon, restricting its explanatory comments to the reasonableness of defendant's conduct in leaving a loaded gun accessible to others in his apartment. By selectively interpreting its charge to the jury in relation to one aspect only of the critical events, the trial court may have misled the jury and influenced it to return a guilty verdict based solely on that conduct.

[111 N.J. at 380-81, 545 A.2d 119.]
Additionally, because the Supreme Court viewed the jury's questions as suggesting that some of the jurors did not understand the concept of recklessness, it added:
Rather than repeating the abstract definition that left the jury uncertain in the first place, the trial court might have explained "recklessly" by comparing it with other mental states, such as purposely (N.J.S.A. 2C:2-2(b)(1)), knowingly (N.J.S.A. 2C:2-2(b)(2)), and negligently (N.J.S.A. 2C:2-2(b)(4)). The jury's understanding of these distinctions could have been enhanced if these mental *1099 states had been clarified by illustrative examples.

[Id. at 381, 545 A.2d 119.]
The jury instructions here do not suffer from a selective recitation of those facts the jury might have found from the respective versions of the events. Moreover, the jury's questions do not reflect a misunderstanding over recklessness per se, but rather over the heightened element of circumstances manifesting extreme indifference to human life. In that respect, the reinstructions properly focused the jury upon the distinction between a probability of serious bodily injury as opposed to a possibility of such injury.
Perhaps defining negligence and carelessness might not have been improper, but we do not think it was crucial for the jury to be told of the difference between recklessness, negligence and carelessness. What was required was that the instructions explained to the jury the heightened recklessness required for aggravated assault. As explained by the trial judge:
[t]here's nothing in this case ... which requires that I define the defendant's defense. The defendant said it was negligence; he explained negligence in his summation. Clearly attempted in his summation to distinguish negligence from recklessness. The standard is recklessness, and the jury, as in the other cases, if the jury need clarification, they can ask for it; and if they ask for it, maybe at that time it's appropriate to define the different elements, but they haven't asked for it. And I'm satisfied that the charge is quite clear. Unless they indicate they need some additional guidance, I don't see where under the circumstances I should be defining the different standards.
"The trial court has an absolute duty to instruct the jury on the law governing the facts of the case," so where circumstances require, "the charge must provide a `comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Concepcion, supra, 111 N.J. at 379, 545 A.2d 119 (quoting State v. Green, 86 N.J. 281, 287-88, 430 A.2d 914 (1981)). Nonetheless, we generally leave it to the sound discretion of the trial judge to decide when and how to comment on the evidence. State v. Robinson, 165 N.J. 32, 45, 754 A.2d 1153 (2000). See State v. Brims, 168 N.J. 297, 306-07, 774 A.2d 441 (2001). Moreover, a defendant is not "entitled to have the jury instructed in his own words," but only "to an adequate instruction on the law." State v. Pleasant, 313 N.J.Super. 325, 333, 712 A.2d 1215 (App.Div.1998), aff'd, 158 N.J. 149, 728 A.2d 223 (1999). We are satisfied here that the trial judge did not abuse his sound discretion in declining to discourse on negligence and carelessness. Counsel fully conveyed those concepts to the jury in summation. We have no concern that the jurors did not understand the difference between recklessness, negligence and carelessness. Moreover, given the particular, rather egregious, facts here, there was no evidential basis for the jury to conclude that defendant was no more than negligent or careless. Any error, therefore, would have been harmless.

IV.

Failure to Instruct How Intoxication Evidence Related to "Recklessness" and "Manifest Extreme Indifference to the Value of Human Life"
In Point ID, defendant points out that he had requested the following charge on the issue of defendant's intoxication:
you may conclude that the defendant's drinking, in and of itself, was reckless, or you may consider it as just another factor in determining whether the defendant *1100 acted recklessly. However ... when you consider this issue, the drinking must be more than casual drinking and more than mere intoxication; it must be exceptional drinking and to a marked extent in order for it to be reckless under circumstances manifesting extreme indifference to the value of human life.
He claims the judge's refusal to include this in the jury charge was reversible error. We disagree.
To be sure, where reckless manslaughter and death by auto are before a jury and intoxication forms one of the aspects of the alleged recklessness, such instructions must be given. As the Supreme Court has said:
Although driving while intoxicated may alone satisfy the recklessness required by the death by auto statute, State v. LaBrutto, 114 N.J. 187, 204, 553 A.2d 335 (1989), more is required for reckless manslaughter. When, as here, the State relies on the extent of drinking as one of "the additional act[s] of death causative recklessness," that drinking must "be more than casual drinking and more than mere intoxication, rather, it would have to be exceptional drinking to a marked extent." State v. Scher, 278 N.J.Super. 249, 269, 650 A.2d 1012 (App.Div.1994), certif. denied, 140 N.J. 276, 658 A.2d 299 (1995). In other words, a defendant's predriving conduct, such as drinking, and conduct associated with the driving must be so extraordinary and extreme as to satisfy the reckless manslaughter standard. Ibid. That standard is "quantitatively greater than the recklessness contemplated in a death-by-auto charge and qualitatively less than the recklessness required to support an aggravated manslaughter case." [State v. Milligan, supra, 104 N.J. [67,] at 73, 514 A.2d 1316 [(1986)] (Clifford, J., dissenting). That is so because "[t]he practice in our State implicitly recognizes that only a gross deviation from reasonable care amounts to recklessness" required in a reckless manslaughter case. State v. Concepcion, 111 N.J. 373, 382, 545 A.2d 119 (1988) (Handler, J., concurring).

[State v. Jamerson, supra, 153 N.J. at 335, 708 A.2d 1183.]
See also State v. Choinacki, 324 N.J.Super. 19, 48, 734 A.2d 324 (App.Div.), certif. denied, 162 N.J. 197, 743 A.2d 849 (1999); State v. Scher, supra, 278 N.J.Super. at 269, 650 A.2d 1012.
We repeatthe focus of this appeal, the aggravated assault conviction, is not an offense involving mere recklessness as the required mental state. Moreover, it was not only defendant's intoxication that formed the predicate for the aggravated assault charge. Defendant's conduct in the parking lot after the reception, as observed by the State's witnesses, and his excessive speeding in an area he admitted he was unfamiliar with and at a time he knew he would have to negotiate an unfamiliar exit ramp, bespeak much more than recklessness by casual intoxication.
Affirmed.
NOTES
[1] N.J.S.A. 2C:2-2(b)(3) defines "reckless" as: A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. "Recklessness," "with recklessness" or equivalent terms have the same meaning.