224 N.J. Super. 711 (1988)
541 A.2d 284
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
THOMAS E. JUINTA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 5, 1987.
Argued April 11, 1988.
Decided May 9, 1988.
*713 Before Judges O'BRIEN, HAVEY and STERN.
Peter B. Meadow argued the cause for appellant (Alfred A. Slocum, Public Defender, attorney for appellant; Peter B. Meadow, designated counsel, of counsel and on the brief).
Robin Parker, Deputy Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General, attorney; Robin Parker, of counsel and on the brief).
The opinion of the court was delivered by STERN, J.A.D.
Defendant was indicted for the purposeful or knowing murder of Lisa Zehring, in violation of N.J.S.A. 2C:11-3. Tried by jury, defendant was found not guilty of murder, but guilty of aggravated manslaughter, N.J.S.A. 2C:11-4a. He was sentenced to a term of 20 years, with ten years to be served before parole eligibility. On this appeal, defendant argues:
Point One: THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY CONCERNING THE AFFIRMATIVE DEFENSE OF MENTAL DISEASE OR DEFECT (Not Raised Below)
Point Two: THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO INSTRUCT THE JURY CONCERNING THE LESSER INCLUDED OFFENSE OF RECKLESS MANSLAUGHTER (Not Raised Below)
Point Three: DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE, UNDULY PUNITIVE, DISPARATE AND BOTH LEGALLY AND MORALLY INAPPROPRIATE. FURTHERMORE, THE COURT BELOW IMPROPERLY *714 CONSIDERED SENTENCING FACTORS IN VIOLATION OF THE SENTENCING PRINCIPLES OF THE CRIMINAL CODE AND THE PROCEDURAL PROTECTIONS OF NEW JERSEY COURT RULES
We reverse and remand for a new trial.
A brief recitation of the facts is required to understand the contentions. Defendant suffered from learning and neurological difficulties and had a long history of violent behavior. He assaulted his mother and others, and was institutionalized for evaluation and treatment at various times throughout his life. Defendant was 23 years old at the time of trial, which occurred approximately seven months after Ms. Zehring's death.
Defendant's mother testified that defendant was unable to speak in a manner that was intelligible to strangers until after his fourth birthday. Defendant's kindergarten teacher felt that he had some sort of disability, and he was evaluated by the school district's "study team." The study team concluded that defendant had some type of neurological impairment, and because of this, he was placed in a "neurological impaired school."
When defendant was eight years old, he was diagnosed at the Morristown Hospital Evaluation Center as "functioning at a level of borderline retardation with neurological impairment." His mother was told that defendant "had auditory conceptual problems and he was borderline retarded."
For three years defendant attended the Harbor School in Red Bank, a school for neurologically impaired children. He subsequently returned to the classes for the neurologically impaired in the public school system until approximately February 1979, when he was roughly 16 years old. During the time defendant was attending these classes, he had several episodes in which he violently assaulted family members and peers. He also suffered a psycho motor seizure, was classified as retarded and had an IQ in the range of 61-73.
In January 1979, defendant was referred by his school to the Jersey Shore Medical Center for a diagnostic work-up. Dr. Wilson at the Medical Center concluded that defendant had *715 "incipient childhood schizophrenia." From February 9 to February 26, 1979, defendant was a patient at Payne-Whitney Psychiatric Clinic in New York City for diagnostic purposes. At Payne-Whitney, a diagnosis was made of "childhood schizophrenia and borderline mental retardation," including "[m]ultiple handicapped, mental brain dysfunction."
From April 1980 until August 1982, defendant attended the Devereaux School, a residential school in Pennsylvania. The doctors at Payne-Whitney specifically recommended placement in a residential school setting with a structured environment.
Shortly after defendant left the Devereaux School, he was enrolled in a vocational rehabilitation center in Tinton Falls. At the center, he received job training and also performed some work for which he was paid. Defendant remained at the vocational center for a year and a half, until July 1984, when he left to take a stockroom job in Holmdel. After working for approximately two weeks in the stockroom, he quit that job. Because defendant left his job, and at the suggestion of the professionals at the vocational center, his parents directed defendant to leave their house, where he had been living, on August 6, 1984. He had lived with his parents from the time he left the Devereaux School in August 1982, until August 1984, except for a period between April 1983 and September 1983 when he lived in a boarding house in Red Bank.
From August 6 until August 10, 1984, defendant lived with friends. On the evening of August 10 or the early morning of August 11, 1984, he was at a party with his "girlfriend." At that time, defendant got into a "fight with his girlfriend and bent her finger back and somebody called the police." Defendant apparently threatened to commit suicide, so the police took him to Riverview Hospital. From there he was transferred to Marlboro Psychiatric Hospital. He remained at Marlboro Psychiatric from August 11, 1984 to January 22, 1985.
For three months before leaving Marlboro, defendant lived in one of the cottages on the Marlboro Hospital grounds within *716 the psycho-socio rehabilitation center operated by Pathways, Inc. Defendant attended vocational training classes and other sessions and activities sponsored by Pathways. When he left Marlboro on January 22, 1985, defendant was placed by Pathways into a semi-independent apartment with another Pathways' patient. He remained under the supervision of his case manager. Other patients of Pathways were located in the same complex. Defendant, in fact, used the Pathways' "hotline" number on the evening before the killing and appeared disturbed by overhearing a conversation relating to the suicide of his friend's girlfriend. However, the placement in the apartment complex was not the type of structured or supervised environment which had been recommended at the time he left Devereaux.
In the early morning of February 3, 1985, defendant caused the death of Ms. Zehring. He did not dispute that fact at trial. He had met Ms. Zehring at Pathways.
Later in the day on February 3, 1985, defendant gave a statement to the police in which he confessed to killing Ms. Zehring. The statement, which was admitted into evidence at trial, describes the events surrounding Ms. Zehring's death as follows:
Lisa and I was together on Saturday at my apartment. She slept over Saturday night, slept in the same room. Lisa went to bed about 7:30, I stayed up to watch some television. I went to bed about 9 p.m. We started off in separate beds, she was in the left bed and I was in the right bed. Sometime during the night, she got in bed with me. When she got in bed with me, she asked me what time it was and I told her about 5 a.m. I tried to go back to sleep but I couldn't. Just prior to her getting into bed with me, I was dreaming about Lisa getting killed in the apartment in the bedroom with a knife. We both got up and she told me about a dream she had about George threatening her. I did not tell her about my dream. After we finished talking about the dream, she called her roommate, Lauren, and told her about the dream involving George, and she wanted to know from Lauren whether she should call the police.
She told me that Lauren told her not to call the police, but I thought she should, so she called the police and she talked to the dispatcher and then I talked to the dispatcher and he said that the detectives wouldn't be in till 8 and to call back then.

*717 We both took a bath together, I got out first and dried myself off and got dressed and made a pot of coffee. She was still in the tub adding water to it. She only stayed in the tub a couple of minutes, she got out, dried off, and went into the bedroom. At this point, my dream started coming back to me, and voices were telling me to kill her. I went into the kitchen and got a knife out of the kitchen drawer which is located next to the sink. Then I went back into the bedroom.
When I went back into the bedroom, Lisa was standing up putting her bra on. I put my left hand around her mouth, stabbed her in the chest with my right hand, then I stabbed her in the neck, then I stabbed her in the chest again. I guess during this, she had a bowel movement, and she stepped in it. I laid her down on the floor and took the towel she was drying herself off with, and laid it over her. I left it over her for about 5 minutes, then I took it and put it in the garbage under the sink in the kitchen.
I called Lauren and told her that Lisa was dead, but I didn't tell her who killed her, but I did tell her this was T.J. After I got off the phone, I changed the shirt I was wearing, a red shirt with the name Bunting on the back, I don't remember what I did with it.
Right after I killed her, I wrote a note on a yellow piece of paper and put it on top of her, I don't remember what it said. The voices were telling me to do it. I took the knife into the kitchen, I rinsed it off, I dried it, and put the knife back in the kitchen drawer. Then I called the police and told them that I came back and my girlfriend was murdered.
The statement also contained the following colloquy:
Q. Could you describe Lisa physically and what was your relationship with her?
A. She's 25, white female, about 5'6". Girlfriend/boyfriend relationship.
Q. While you had your hand around Lisa, did you receive any injuries?
A. Yes. I think she bit my left wrist.
Q. Could you describe the knife that you used?
A. About 5" long with a brown handle, more like a carving knife.
Q. When you put the towel over her, where did you place it and was she dead at that time?
A. She was barely breathing and I put it over her face.
Q. At what point did you remove the towel?
A. After I cleaned the knife, I went back to check her and she was dead. I took the towel and put it in the garbage.
* * * * * * * *
Q. After Lisa got in bed with you, how long was it before you both got out of bed?
A. About an hour.
Q. Did either you or Lisa engage in sex last night?
A. Yes, in the bedroom. This occurred before she went to bed.

*718 Q. Was there a struggle with Lisa when you walked into the bedroom with the knife?
A. No, she had her back to me, but there was a struggle when I was stabbing her. There was a struggle when I was stabbing her, the knife would bend when I would try to put it in her so I had to hold the handle at its lowest point.
Q. Could you explain to us the sequence of the injuries?
A. The first time I stabbed her in the chest, she fell down and while she was on the floor, I stabbed her in the neck and the chest again. The first one was from behind and others were straight down while she was on the floor, I was on my knees. After the first stab wound, I thought she was having a fit because she had epilepsy.
Q. Tom, is there anything that you would like to add to this statement?
A. No.
The principal issue at trial related to the insanity defense. This testimony was directed to the insanity standard, as embodied in N.J.S.A. 2C:4-1. Dr. Alvin Krass, a licensed practicing psychologist, and Dr. John P. Motley, a psychiatrist, testified for defendant, and Dr. Steven S. Simring, also a psychiatrist, testified for the State.
Dr. Krass found that defendant suffered from a "severe mental illness" and thus could not "deal even with modest stress without disintegrating, without coming apart." He testified that defendant "couldn't be expected to live independently," without "daily supervision." He also indicated that stress or frustration caused defendant "to act out in a violent manner."
Dr. Motley concluded that defendant "was suffering from a mental illness which impaired his ability to understand the quality of his act and to truly understand that at the time he was performing the act that it was wrong." His diagnosis was "schizophrenic reaction, paranoid type, and a borderline mental retardation." He concluded that defendant knew the nature of his act, that he was stabbing the victim, but that "[h]e did not understand the quality of his act."
Dr. Simring could not "arrive at just one diagnosis, because Mr. Juinta present[ed] a complex diagnostic problem." He concluded that defendant "suffer[ed] from intermittent explosive disorder" or a "borderline personality disorder," "alcoholism" *719 and an "attention deficit disorder with hyperactivity" or "minimum brain dysfunction." Dr. Simring was unable to diagnose defendant as suffering from "schizophrenia." While he indicated that "[a] stressful situation [could] affect anybody, but the patient who suffers either from intermittent explosive disorder or from a borderline personality problem [is] more apt to flare than most people," Dr. Simring testified that defendant knew the quality of his act and that what he was doing was wrong. He stated:
"It is my opinion he does not meet the McNaughten standard. I do believe he suffers from a significant psychiatric disturbance. And while I do not think  it is my opinion that he does not have schizophrenia, I think he suffers from a borderline personality disorder and the other diagnoses, any of which could be enough of a foundation to represent the significant mental disorder."
It is clear that the testimony and expert opinions were thus focused on the requirements of N.J.S.A. 2C:4-1 and were not related to the requisite state of mind to prove criminal homicide, N.J.S.A. 2C:4-2.
Defendant contends that given the difference between aggravated manslaughter (involving "circumstances manifesting extreme indifference to human life"), N.J.S.A. 2C:11-4a, and reckless manslaughter, N.J.S.A. 2C:11-4b (involving a "mere possibility of death," see State v. Curtis, 195 N.J. Super. 354, 364 (App.Div. 1984), certif. den. 99 N.J. 212 (1984)),[1] the jury should have been instructed on both offenses, at least after the trial court found proof justifying the former. For either offense, the jury must find that defendant acted recklessly by "consciously disregard[ing] a substantial and unjustifiable risk". See N.J.S.A. 2C:2-2b(3); 2C:11-4; State v. Breakiron, 108 N.J. 591, 605 (1987). See also State v. Serrano, 213 *720 N.J. Super. 419, 423 (App.Div. 1986), certif. den. 107 N.J. 102 (1987) (where charge was given on aggravated manslaughter and manslaughter, as well as murder and insanity defense in case involving similar proofs). However, we do not have to decide whether the failure to charge reckless manslaughter itself warrants reversal, see and compare, State v. Choice, 98 N.J. 295 (1985); State v. Powell, 84 N.J. 305 (1980), because of the need for a new trial on other grounds.
We are satisfied that here, as in State v. Breakiron[2] and State v. Serrano, the "diminished capacity defense should have been presented to the jury." 213 N.J. Super. at 424. While in those cases there was a request for such instruction, and in this case there was not, it is now clear that "diminished capacity is not an affirmative defense that will justify or excuse conduct otherwise criminal, but rather allows the introduction of evidence relevant to the question of whether the State has proven beyond a reasonable doubt the requisite criminal mental state," State v. Breakiron, supra, 108 N.J. at 620, and "[a] defendant is entitled to have the jury charged that relevant evidence of mental disease or defect may be considered either with respect to an insanity defense or as negating the state of mind required for a particular offense," id. at 621. Hence, even though the trial judge was not requested to charge "diminished capacity," defendant is entitled to have the issue presented to the jury in this case where the issue was raised in a case on direct appeal when Breakiron was decided. Cf. State *721 v. Powell, supra, (requiring charge on lesser included offense where warranted by the evidence even in the absence of request); see also State v. Jasuilewicz, 205 N.J. Super. 558, 574-575 (App.Div. 1985), certif. den. 103 N.J. 467 (1986). This is particularly true in this case where the court declined to charge simple manslaughter, cf. State v. Powell, supra, and because the charge relates to an element of the offense and the requisite state of mind. See State v. Grunow, 102 N.J. 133, 148 (1986) (defendant convicted of aggravated manslaughter); State v. Fair, 45 N.J. 77, 90-93 (1965); see also State v. Crisantos, 102 N.J. 265, 273 (1986); State v. Green, 86 N.J. 281, 287-289 (1981).
As stated in State v. Serrano, supra, 213 N.J. Super. at 424-425:
[T]he jury might well have assessed defendant's state of mind differently had it been specifically instructed that the proofs concerning his mental condition could bear on his ability to act purposely or knowingly; the charge as given suggested to the jury that if the proofs of mental condition did not sustain the N.J.S.A. 2C:4-1 insanity defense, they would not serve to mitigate defendant's responsibility. Consideration of the diminished capacity defense might well have led the jury to conclude that defendant acted only `recklessly' or, indeed, without any culpable state of mind. The trial judge's refusal to charge the substance of N.J.S.A. 2C:4-2 thus foreclosed the jury from considering a viable affirmative defense which could mitigate or remit defendant's criminal responsibility.
In Serrano, the court charged the jury on murder, aggravated manslaughter, manslaughter, and the defense of insanity, N.J.S.A. 2C:4-1. Similarly, in State v. Breakiron, the court charged on insanity but not diminished capacity, and it does not appear that any lesser included offense alternative to the murder was presented to the jury. See State v. Breakiron, 210 N.J. Super. 442 (App.Div. 1986), aff'd and rev'd 108 N.J. 591 (1987). As neither Breakiron nor Serrano considered the subject expressly, we must decide whether the doctrine of "diminished capacity" applies to an offense carrying only a "reckless" culpability requirement, such as aggravated manslaughter or manslaughter, N.J.S.A. 2C:11-4, for if it does not, the error in not charging it would be harmless in light of the *722 conviction of an offense with a "reckless" culpability requirement.
It has been suggested that the diminished capacity doctrine embodied in N.J.S.A. 2C:4-2 does not excuse "reckless" conduct because "the defense of intoxication ... is similar to diminished capacity insofar as it bears upon the required mental states of the crime," State v. Breakiron, supra, 108 N.J. at 603-604 (1987), and because the drafters of the New Jersey Code of Criminal Justice "would have limited the diminished capacity defense of mental disease or defect to cases in which `purpose ... is an element of the offense.'" State v. Breakiron, supra, 108 N.J. at 606 (citation omitted). See also State v. Ramseur, 106 N.J. 123, 268-69 (1987).
Evidence of intoxication may be introduced to disprove that a defendant acted "purposely" or "knowingly," but not to disprove that he acted "recklessly." State v. Warren, 104 N.J. 571, 575-576 (1986); State v. Cameron, 104 N.J. 42 (1986). "Consequently, under the New Jersey Code, when evidence of intoxication is introduced, a defendant may still be convicted of aggravated manslaughter or manslaughter, both of which require only that the defendant act `recklessly.'" State v. Warren, supra, 104 N.J. at 576. But, while diminished capacity is in many ways analogous to intoxication, voluntary intoxication does not excuse reckless conduct only because of the wording of N.J.S.A. 2C:2-8 which provides that "[w]hen recklessness establishes an element of the offense, if the actor, due to self-induced intoxication, is unaware of a risk of which he would have been aware had he been sober, such unawareness is immaterial." N.J.S.A. 2C:2-8b. "The statute acknowledges not only that intoxication does not excuse criminal conduct unless it disproves an element of the offense charged, but also that unawareness of a risk because of self-induced intoxication is immaterial when, as is the case with manslaughter, recklessness is an element of the offense." State v. Warren, supra, *723 104 N.J. at 577.[3]N.J.S.A. 2C:4-2 contains no similar limitation with respect to any culpability requirement. To the contrary, the Legislature, in adopting the Code, "broadened N.J.S.A. 2C:4-2 to provide that `[e]vidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense.'" State v. Breakiron, supra, 108 N.J. at 607 (quoting N.J.S.A. 2C:4-2). The provision relates to any required state of mind, without limitation. Moreover, diminished capacity "does not seek to excuse the defendant from criminal responsibility. Rather, the concept refers to evidence that, in theory, affects the presence of essential mental elements of the crime," State v. Breakiron, supra, 108 N.J. at 601, and that is true with respect "to proof of any essential mental element of a crime." Id. at 603 (emphasis added). Diminished capacity, therefore, provides neither justification nor excuse, but is "a factor bearing on the presence or absence of an essential element of the crime as designated by the Code.... For the purpose of determining criminal guilt, diminished capacity either negates the state of mind required for a particular offense, if successful, or it does not." Id. at 608-609. See also State v. Ramseur, supra, 106 N.J. at 269. The State always has the burden of proving the essential element of the offense, and its failure to prove that defendant acted recklessly, as defined by the Code, N.J.S.A. 2C:2-2b(3), prohibits a conviction for aggravated manslaughter *724 or manslaughter, N.J.S.A. 2C:11-4, just as the failure to prove the requisite culpability would prevent conviction for a purposeful or knowing homicide, N.J.S.A. 2C:11-3. See State v. Breakiron, supra, 108 N.J. at 613; N.J.S.A. 2C:1-13a.
However, there must be competent, reliable evidence that defendant did not have "the requisite mental state to commit the crime." State v. Breakiron, supra, 108 N.J. at 618 (emphasis added; footnote omitted). In this case, notice of an insanity defense was given, N.J.S.A. 2C:4-3; R. 3:12, and the evidence introduced on that defense was "relevant to the defendant's ability to form the requisite mental state," State v. Breakiron, supra, 108 N.J. at 621; see also id. at 619, including the required culpability for aggravated manslaughter or manslaughter. See State v. Curtis, supra, 195 N.J. Super. at 364. As in State v. Serrano, supra, the trial court committed reversible error in failing to charge diminished capacity where the evidence could justify a finding that defendant did not have the requisite state of mind. On the other hand, "if the jury or trier of fact determines that the mental disease or defect did negate the requisite mental state for murder, conviction of [aggravated manslaughter or] manslaughter is not precluded if the evidence establishes the essential elements of that crime." State v. Breakiron, supra, 108 N.J. at 621.
The purposeful and knowing culpability elements required to prove murder and the reckless culpability requirements are different, and while the State might not be able to prove the former beyond a reasonable doubt, evaluation of the proofs relevant to the latter requires an independent judgment. In other words, the jury in a murder prosecution must be clearly advised that where diminished capacity precludes a murder conviction, that does not necessarily mean that the State has failed to prove the elements of aggravated manslaughter or manslaughter. See State v. Breakiron, supra, 108 N.J. at 610, 621. While the defendant may not have had the capacity to have acted purposefully or knowingly, that does *725 not necessarily mean that he could not have acted recklessly. In this case, as defendant has already been acquitted of murder, the instructions on retrial must be related exclusively to the elements of aggravated manslaughter, and, if appropriate, manslaughter.
Accordingly, the judgment of conviction is reversed and the matter is remanded for retrial at which time the defendant "is entitled to have the jury charged that relevant evidence of mental disease or defect may be considered either with respect to an insanity defense or as negating the state of mind required for a particular offense," State v. Breakiron, supra, 108 N.J. at 621, here involving reckless conduct necessary to prove aggravated manslaughter and manslaughter.
When the Code of Criminal Justice was adopted in 1978, the Legislature made a reasoned determination to reject the Model Penal Code's provision on the insanity defense and to retain the M'Naghten rule. See N.J.S.A. 2C:4-1 and Statement to S 738 which became L. 1978, c. 95. See also State v. Maik, 60 N.J. 203, 212-213 (1972), overruled on other grounds, State v. Krol, 68 N.J. 236 (1975); State v. Sikora, 44 N.J. 453, 470, (1965); State v. Lucas, 30 N.J. 37 (1959). The Legislature, by retaining M'Naghten, also rejected the "mental disease or defect" standard, adopted in Durham v. United States, 214 F.2d 862, 875 (D.C. Cir.1954), and the recommendation of the Law Revision Commission which drafted the Code as well as the Model Penal Code on which it was based. See II Final Report of the New Jersey Criminal Law Revision Comm., 95-98 (1971).[4] However, as noted by one commentator, as a result of a series of *726 amendments to N.J.S.A. 2C:4-2 since the original adoption of the Code, "[t]he effect [of the amendments] was to transform the section from one intended to deal solely with admissibility of evidence into what now could appear to be a second mental impairment defense distinct from insanity." CANNEL, TITLE 2C, Comment N.J.S.A. 2C:4-2 (1987) at 166. In fact, a defendant now successfully asserting mental disease or defect need not prove insanity. We take no position on the policy for it involves a legislative judgment. But while provisions requiring commitment and evaluation of those acquitted by reason of insanity exist in the Code, see N.J.S.A. 2C:4-8, -9, none expressly exist regarding defendants acquitted by reason of mental disease or defect. We invite the Legislature to review these matters expeditiously.
Remanded for further proceedings in accordance with this opinion.
NOTES
[1] When the Code of Criminal Justice was originally adopted, it proscribed murder (causing death purposely or knowingly) and manslaughter. See L. 1978, c. 95; N.J.S.A. 2C:11-2, -3, -4. By amendment, effective on the effective day of the code, however, murder was expanded to proscribe causing death or serious bodily injury resulting in death, and the concept of aggravated manslaughter was added. See L. 1979, c. 178 §§ 21, 21A; N.J.S.A. 2C:11-3; 2C:11-4a. See also L. 1981, c. 290 § 13.
[2] This case was originally submitted to us on October 5, 1987, but we requested supplemental briefs and oral argument on the impact of State v. Breakiron with respect to a crime with a reckless culpability requirement. The State, in its supplementary brief and at argument, agreed that the diminished capacity "defense" embodied in N.J.S.A. 2C:4-2 applied to a case involving a reckless culpability requirement. The State argued only that the proofs did not warrant presentation of the issue to the jury in this case. We disagree in light of the proofs presented by defendant on the insanity defense. See State v. Breakiron, supra 108 N.J. at 619-621. The trial judge charged the jury that insanity was a defense to both murder and aggravated manslaughter, and that defendant could not be convicted if insane at the time of offense.
[3] "By failing to instruct the jury that it could accept defendant's intoxication as a defense to murder and still convict him of manslaughter, the court permitted the jury to believe that defendant's intoxication prevented a conviction for manslaughter. In effect, the court unintentionally prevented defendant's conviction on the lesser included offenses of aggravated manslaughter or manslaughter, and forced the jury to choose between a murder conviction and an acquittal." State v. Warren, supra, 104 N.J. at 578. The jury chose the former, and the murder conviction was vacated and the matter remanded for a new trial in the absence of an express instruction that voluntary intoxication did not excuse reckless conduct and was not a defense to aggravated manslaughter and manslaughter.
[4] Under pre-code law neither voluntary intoxication nor use of drugs excused second degree murder because of "the demands of public security," State v. Maik supra, 60 N.J. at 215; see also State v. Stasio 78 N.J. 467 (1979). A defendant could be acquitted by reason of insanity, but had to be committed until no longer a danger to himself or others. State v. Maik, supra, 60 N.J. at 216-221; State v. Krol, supra. Aggravated manslaughter, like second degree murder under title 2A, involves homicide by "extreme indifference". See State v. Grunow, supra, 102 N.J. at 139.