**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3442-16T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DENNIS W. POZNIAK,

     Defendant-Appellant.

_____

Argued January 22, 2019 – Decided March 11, 2019

Before Judges Messano and Rose.

On appeal from Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 15-07-0872.

Timothy S. Farrow argued the cause for appellant (Dash Farrow, LLP, attorneys; Timothy S. Farrow, on the briefs).

Alexis R. Agre, Assistant Prosecutor, argued the cause for respondent (Scott A. Coffina, Burlington County Prosecutor, attorney; Alexis R. Agre, of counsel and on the brief).

PER CURIAM

At 9:06 a.m. on January 31, 2015, Burlington County Central Communications received a 9-1-1 call from B.W.[1] B.W. shared a home with her father, sister, and her sister's boyfriend, defendant Dennis W. Pozniak. B.W. reported her sister was bleeding and in a lifeless condition on the living room couch, and her father's lifeless and bloody body was on the bed in his room. B.W. did not know if defendant was still in the house. Police arrived and, after confirming B.W.'s sister and father were deceased, proceeded upstairs and found defendant in a locked bedroom, lying in bed with covers drawn. Defendant had lacerations on his arms, legs, feet, and neck, some of which were still bleeding, and, when questioned by police, said he had cut himself. Police asked if defendant had "hurt the others"; he admitted he had.[2] Police took defendant into custody and transported him to the hospital.

After hours of processing the scene, investigators found the murder weapon, a pipe wrench, hidden under a television stand in the living room. The

---

[1] We use initials when possible to maintain the confidentiality of the victims and their family.

[2] At trial, one of the officers testified to these statements by defendant. Defendant's responses in the transcript from the audible portion of the body camera recording, however, were "indecipherable."

medical examiner, Dr. Ian Hood, testified that both victims died of blunt force trauma to the head caused by multiple, forceful blows with a heavy object.

A jury convicted defendant of two counts of first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2), as well as one count of third-degree possession a weapon with unlawful intent, N.J.S.A. 2C:39-4(d), and one count of fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d). After denying defendant's motion for a new trial and ordering appropriate mergers, the judge sentenced defendant to two consecutive thirty-year terms of imprisonment, each with thirty years' parole ineligibility.

Before us, defendant raises the following points on appeal:

> POINT ONE
>
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S REQUEST TO CHARGE THE JURY WITH LESSER-INCLUDED OFFENSES.
>
> POINT TWO
>
> THE TRIAL [COURT] ERRED BY GRANTING THE STATE'S MOTION TO REDACT DEFENDANT'S STATEMENT, SINCE THE REDACTED STATEMENT MISREPRESENTED THE FULL . . . STATEMENT.
>
> POINT THREE
>
> THE TRIAL COURT ERRED BY DENYING DEFENDANT'S MOTION TO INTRODUCE HIS

3

PRIOR STATEMENTS CONCERNING HIS STATE OF MIND AS PERMITTED UNDER [N.J.R.E.] 803(c)(3).

POINT FOUR

THE TRIAL COURT ERRED IN FAILING TO FURTHER INQUIRE OR POLL THE JURY REGARDING ITS NOTE ALLEGING JUROR MISCONDUCT.

POINT FIVE

THE TRIAL COURT ERRED AS A MATTER OF LAW IN ITS DECISION TO REJECT THE DEFENSE'S MOTION TO DISMISS THE INDICTMENT.

A. THE PROSECUTOR IMPROPERLY COMMENTED ON THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE AT THE GRAND JURY PROCEEDING.

B. [THE] PROSECUTOR FAILED TO PRESENT CLEARLY EXCULPABLE EVIDENCE TO THE GRAND JURY.

C. THE PROSECUTOR FAILED TO INSTRUCT THE GRAND JURY AS [TO] THE DEFENSES OF INTOXICATION AND MENTAL DISEASE OR DEFECT.

# I.

## A.

The sole issue in the case was defendant's mental state at the time of the murders. The State contended that defendant grew increasingly upset at his girlfriend for permitting her father, who suffered from alcoholism, to remain in the home. The State also argued that defendant began to suspect that his girlfriend no longer saw a long-term future in their relationship and was about to ask defendant to leave the home.

The State's case was bolstered by the testimony of friends and family members, as well as numerous text messages, beginning a week before the murders, in which defendant expressed frustration and outright anger at his girlfriend's father and the disruption his presence brought to the household. In response to one of the messages, defendant's brother said it sounded as if defendant planned to kill someone. In text messages sent late on the night of the murders to his mother, brother, and cousin, defendant spoke ominously of suicidal thoughts. Defendant sent his mother a text in which he identified a small plastic case in which he had placed money, his digital camera, pictures of his daughter and other valuables, and told his mother where it would be if "something were to happen" to him.

A-3442-16T3

The State also recovered Google searches defendant ran that night seeking information as to how much Xanax and other drugs he would need to ingest to commit suicide.

Additionally, largely through forensic evidence, the State was able to argue that defendant carefully planned the murders, silently going into his girlfriend's father's room, closing the door behind him, and killing the man as he slept. According to the State's theory, defendant then went downstairs and killed his girlfriend as she lay sleeping on the sofa. The State submitted that defendant carefully tried to hide the murder weapon and, only then, retreated to his room to inflict numerous, albeit non-fatal, wounds to himself.

After conducting a pre-trial N.J.R.E. 104(c) hearing, the judge ruled that defendant voluntarily gave a statement to police at the hospital after waiving his Miranda[3] rights. The jury heard a redacted version of the statement, in which defendant told police he tried to commit suicide by cutting himself and taking large amounts of prescription drugs that he had on hand, as well as drinking a large amount of wine. Defendant expressed anger at his girlfriend's father and the trouble he caused because of his inability to stay sober. Defendant was hurt

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

that his girlfriend sided with her father and told defendant that she would have to take care of her family for the rest of her life. Defendant never admitted to the killings, nor, in the redacted version of the statement, was he asked.[4]

Through his own testimony, that of his mother, father, the mother of his daughter and two experts, defendant sought to establish his long-standing history of substance abuse and mental illness, including suicide attempts and drug abuse beginning in adolescence. Defendant recalled trying to commit suicide on the night in question, but he did not recall anything about the murders. Defendant also testified to delusional behavior during the days leading up to the homicides, as well as a hallucination in the past.

Dr. Leland Mosby, a clinical and forensic psychologist, testified that defendant suffered from a "major depressive disorder with psychotic features" and a "personality disorder with paranoia and schizotypal features." Dr. Mosby explained these mental illnesses "impaired [defendant's] ability to form intent and intentionally to harm people, to harm the victims." However, contrary to the numerous text messages defendant sent on the night of the murders and

---

[4] We address below the argument defendant raises in Point Two. It suffices at this point to say that in redacted portions of the statement, defendant implied he believed his girlfriend was still alive and outside his hospital room.

defendant's own testimony, Dr. Mosby also opined that defendant lacked the intent to commit suicide.

Dr. Gary Lage, an expert in toxicology and pharmacology, testified primarily from his interview of defendant. He opined that defendant likely suffered the effects of intoxication from the wine and drugs he ingested, such that "his cognitive ability, his thought processes" "would not have been able to form the intent to injure himself" or the victims. However, Dr. Lage's opinion was compromised when the prosecutor asked him to assume the State's version of the sequence of events. Dr. Lage acknowledged those facts would mean defendant took the drugs "after the fact" and would change the doctor's opinion about defendant's lack of intent.

It suffices to say for our purposes that the State's case on rebuttal attacked the conclusions of both defense experts. The prosecutor recalled Dr. Hood, who testified that the toxicological results from blood drawn from defendant at the hospital showed no traces of alcohol. Although there were traces of prescription drugs in defendant's system, Dr. Hood opined this was possible because of defendant's admitted longstanding substance abuse. Dr. Hood also opined that if defendant was as intoxicated as Dr. Lage said he most likely was, defendant would have been unable to execute the murders in such a deliberate fashion. Dr.

8

Steven Simring, a forensic psychiatrist, testified that defendant neither suffered from any mental illnesses, nor did he possess a diminished capacity to understand his actions.

During the charge conference, defendant asked the judge to instruct the jury on aggravated manslaughter, manslaughter and passion/provocation manslaughter. The State objected, arguing the evidence presented no set of facts demonstrating that defendant acted recklessly or in the heat of passion after a reasonable provocation.[5]

The judge denied the request. In a comprehensive oral opinion, the judge reviewed numerous decisions and detailed the State's evidence. In particular, the judge noted the evidence showed that defendant found the wrench from somewhere in the house; went into the bedroom, closed the door, and struck his girlfriend's father in the "most vulnerable area" with "perfect aim"; then left and went to another part of the house to strike his girlfriend multiple times on the head, "where death is likely to occur." Comparing the model jury charges on recklessness, which requires a showing of a "conscious disregard of a substantial

---

[5]  Defendant's brief does not argue it was error to deny a charge on passion/provocation manslaughter. We do not consider the issue further. See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) ("An issue not briefed on appeal is deemed waived.").

and justifiable risk," and "knowing serious bodily injury murder," the judge concluded there was no rational basis for a jury to "acquit [defendant] of . . . purposeful and knowing [murder] and find . . . reckless [conduct] under these factual circumstances[.]"

However, without objection, the judge did instruct the jury on both voluntary intoxication and diminished capacity using the model charges. See Model Jury Charges (Criminal), "Intoxication negating element of the offense (N.J.S.A. 2C:2-8(a))," (rev. Oct. 18, 2005); Model Jury Charges (Criminal), "Evidence of mental disease or defect (N.J.S.A. 2C:4-2)," (rev. June 5, 2006).[6] Because the judge provided these charges without charging any lesser-included offenses of murder, the jury had to either convict defendant of the murders or otherwise acquit him.

---

[6] Because she concluded the facts did not support any lesser-included offenses, the judge did not provide the jury with Model Jury Charge (Criminal), "Effect of intoxication on jury's consideration of lesser offenses involving recklessness (N.J.S.A. 2C:2-8(b))," (Feb. 27, 1989). That model charge reflects a provision of our Criminal Code, "N.J.S.A. 2C:2-8(b)[, which] precludes the admission of evidence of self-induced intoxication to disprove recklessness." State v. Baum, 224 N.J. 147, 162 (2016). We note that the State did not argue at trial, and does not contend before us, that the evidence did not support providing the voluntary intoxication and diminished capacity instructions to the jury.

A-3442-16T3

B.

We can present no better summary of the law and our standard of review than Justice Timpone recently did in State v. Carrero, 229 N.J. 118 (2017).

> N.J.S.A. 2C:1-8(e) mandates that "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." Accordingly, when a defendant requests a jury instruction on a lesser-included offense and is denied the requested instruction, an appellate court reviews the denial of that request, determining whether "the evidence presents a rational basis on which the jury could [1] acquit the defendant of the greater charge and [2] convict the defendant of the lesser." If such a rational basis exists, a trial court's failure to give the requested instruction is reversible error.
>
> The rational-basis test sets a low threshold. A defendant is entitled to a lesser-included offense instruction rationally supported by the evidence, even if the instruction is inconsistent with the defense theory. In deciding whether the rational-basis test has been satisfied, the trial court must view the evidence in the light most favorable to the defendant.
>
> [Id. at 128 (alterations in original) (quoting State v. Brent, 137 N.J. 107, 113, 117 (1994)).]

The issue is simple; did the evidence viewed in a light most favorable to defendant provide a rational basis for the jury to conclude he acted recklessly? We conclude it did, and therefore, we are compelled to reverse and remand the matter for a new trial.

11

C.

We preface our remarks by making clear that there was more than sufficient evidence for the jury to conclude beyond a reasonable doubt that defendant acted purposely or knowingly in killing the two victims. Furthermore, we express no opinion whatsoever about the credibility or persuasiveness of defendant's proofs. That is not our function.

With the exception of felony murder, N.J.S.A. 2C:11-3(a)(3), to be guilty of murder, a defendant must purposely or knowingly cause death or serious bodily injury resulting in death. N.J.S.A. 2C:11-3(a)(1) and (2). Homicide constitutes aggravated manslaughter when the defendant "recklessly causes death under circumstances manifesting extreme indifference to human life," N.J.S.A. 2C:11-4(a)(1), or manslaughter when the homicide is "committed recklessly." N.J.S.A. 2C:11-4(b)(1) (emphasis added).

> The distinction between the two [forms of manslaughter] turns on the degree of probability that the death will result from the defendant's conduct. When it is probable that death will result from that conduct, the standard for aggravated manslaughter is met . . . . However, when it is only possible that death will result, the homicide constitutes reckless manslaughter.
>
> [State v. Galicia, 210 N.J. 364, 378 (2012) (citations omitted).]

"A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct." N.J.S.A. 2C:2-2(b)(3). "The element of criminal recklessness differs from knowing culpability, N.J.S.A. 2C:2-2(b)(2), in that the latter requires a greater degree of certainty that a particular result will occur." State v. Williams, 190 N.J. 114, 123 (2007) (citations omitted).

"The Criminal Code authorizes a defendant to present evidence of a mental disease or defect to 'negate the presence of an essential mental element of the crime . . . .'" Baum, 224 N.J. at 160 (citing State v. Rivera, 205 N.J. 472, 487 (2011)); see also N.J.S.A. 2C:4-2. "This defense 'was designed by the Legislature not as a justification or an excuse, nor as a matter of diminished or partial responsibility, but as a factor bearing on the presence or absence of an essential element of the crime as designated by the Code.'" Ibid. (quoting State v. Breakiron, 108 N.J. 591, 608 (1987)).

> A defendant may raise a diminished capacity defense if (1) he or she "has presented evidence of a mental disease or defect that interferes with cognitive ability sufficient to prevent or interfere with the formation of the requisite intent or mens rea[,]" and (2) "the record contains evidence that the claimed deficiency did affect the defendant's cognitive capacity

to form the mental state necessary for the commission of the crime."

[Id. at 160-61 (quoting State v. Galloway, 133 N.J. 631, 647 (1993)).]

"Evidence of intoxication may be introduced to disprove that a defendant acted 'purposely' or 'knowingly,' but not to disprove that he acted 'recklessly.'" State v. Juinta, 224 N.J. Super. 711, 722 (App. Div. 1988) (citing State v. Warren, 104 N.J. 571, 575-576 (1986); citing State v. Cameron, 104 N.J. 42 (1986)); see also N.J.S.A. 2C:2-8(a). The evidence must provide "a rational basis for the conclusion that defendant's 'faculties' were so 'prostrated' that he or she was incapable of forming an intent to commit the crime." State v. R.T., 411 N.J. Super. 35, 46-47 (App. Div. 2009) (quoting State v. Mauricio, 117 N.J. 402, 418-19 (1990)). As Judge Stern explained in Juinta,

> while diminished capacity is in many ways analogous to intoxication, voluntary intoxication does not excuse reckless conduct only because of the wording of N.J.S.A. 2C:2-8[(b),] which provides that '[w]hen recklessness establishes an element of the offense, if the actor, due to self-induced intoxication, is unaware of a risk of which he would have been aware had he been sober, such unawareness is immaterial.'

[224 N.J. Super. at 722.]

Diminished capacity, however, can negate the mental state of recklessness. Id. at 724.

The trial judge correctly noted that evidence of intoxication or diminished capacity does not compel submission of the lesser-included offenses of aggravated manslaughter or manslaughter to the jury. See, e.g., State v. Ramseur, 106 N.J. 123, 269 (1987) ("A charge on a lesser-included offense cannot be automatically given to a jury when the defense of diminished capacity is raised by a defendant."). "[I]f the proofs support only a conviction of murder or acquittal, any lesser degree of homicide should not be charged as a possible verdict." State v. Sanchez, 224 N.J. Super. 231, 239 (App. Div. 1988) (citing State v. Selby, 183 N.J. Super. 273, 280 (App. Div. 1981)).

In denying defendant's request to submit the lesser-included manslaughter charges, the judge reviewed a number of cases from this court and concluded that the nature and circumstances of the killings in this case did not rationally support a finding that defendant acted with a "conscious disregard of a substantial and unjustifiable risk" that his actions would cause death. For example, she cited State v. Micheliche, where we rejected a claim of error in failing to provide the charge on aggravated manslaughter because there was no evidence that the defendant's intoxication caused a prostration of the faculties sufficient to defeat the mental state, and the murder was "appalling[ly] sever[e]." 220 N.J. Super. 532, 543 (1987). However, while the homicides in this case

15

were gruesome and clearly supported the conclusion they were committed with purpose or knowledge, unlike the defendant in Micheliche, defendant himself testified and provided expert support for his claims.

The judge also cited our decisions in State v. Hammond, 338 N.J. Super. 330 (App. Div. 2001), and State v. Mance, 300 N.J. Super. 37 (App. Div. 1997), for the proposition that the purposeful nature of the murders precluded instructions as to crimes that require only a reckless mental state. However, there was no mitigating evidence of diminished capacity or intoxication adduced in those cases. See Hammond, 338 N.J. Super. at 333-37; Mance, 300 N.J. Super. at 44-47.

Despite the apparent purposeful nature of the homicidal act or acts, several cases have nevertheless accepted that the judge properly charged the jury with lesser-included homicide offenses in light of evidence of diminished capacity or intoxication. This reflects a basic premise: "evidence that the accused had a diminished capacity at the time of the crime is relevant in determining whether it is appropriate to charge aggravated manslaughter and manslaughter as lesser[-]included offenses." State v. Washington, 223 N.J. Super. 367, 375 (App. Div. 1988).

For example, in Warren, the defendant shot his former paramour "with 'military precision,'" by firing three shots, two of which hit her, after calling her over to his parked car. 104 N.J. 571, 573-74. Although not testifying, defendant asserted intoxication as a defense through family and expert testimony. Id. at 574. The trial judge charged the jury with murder, as well as aggravated manslaughter, manslaughter and passion/provocation manslaughter, and provided instructions on intoxication. Id. at 573-75. However, the judge "neglected to relate the intoxication defense to the manslaughter" offenses. Id. at 575.

While not directly addressing whether the facts supported instructions on aggravated manslaughter or manslaughter, the Court nonetheless noted that the effect of the trial court's oversight was to "permit[] the jury to believe that defendant's intoxication prevented a conviction for manslaughter. In effect, the court unintentionally prevented defendant's conviction on the lesser[-]included offenses of aggravated manslaughter or manslaughter, and forced the jury to choose between a murder conviction and an acquittal." Id. at 578. We assume, therefore, that in ordering a new trial, the Court concluded the evidence could support a conviction premised on reckless conduct, despite the deliberate nature of the defendant's fatal assault.

 A-3442-16T3

In Juinta, the defendant was convicted of aggravated manslaughter as a lesser-included offense of murder. 224 N.J. Super. at 713. The defendant brutally stabbed his girlfriend and carefully cleaned and hid the knife afterwards. Id. at 716-18. The defendant presented expert testimony in support of his insanity defense; he told police he heard voices prior to the killing and dreamed of stabbing the victim. Id. at 717. Once again, although we did not explicitly consider whether the evidence could support a charge of reckless homicide, we concluded it was plain error not to provide instructions on diminished capacity and remanded for a new trial. Id. at 720-21.

We directly addressed the issue of whether the evidence could support a verdict of aggravated manslaughter or manslaughter in Washington. There, the defendant stabbed his wife thirty times all over her body, which, when found by a neighbor in the couple's car, still had the knife protruding from her neck. 223 N.J. Super. at 370. Through the testimony of experts and family members, the defendant posited the possibility that he stabbed his wife during an epileptic seizure. Id. at 371. During a psychiatric hospitalization that immediately followed his arrest, the defendant "expressed a lack of awareness that his wife was dead and appeared to be utterly surprised when told that she was dead and that he probably had killed her." Ibid. Although he subsequently provided more

details of the events, the defendant had virtually no recollection of the actual killing. Ibid.

The judge provided instructions on diminished capacity but denied the defendant's request to charge manslaughter as a lesser-included offense. Id. at 372. In reversing the defendant's conviction, Judge Skillman wrote:

> [T]he trial court was required to charge the jury regarding the lesser[-]included offenses of aggravated manslaughter and manslaughter. There was evidence presented that defendant was suffering from an epileptic seizure at the time of the crime and that he was unaware of and unable to control his actions. If the jury had accepted this testimony in its entirety, it could have acquitted defendant by reason of insanity. However, the jury also could have concluded that defendant lacked the cognitive faculties to have acted "purposely" or "knowingly" but that he retained a sufficient awareness of what he was doing and control over his actions to have acted with a "conscious disregard of a substantial and unjustifiable risk."
>
> [Id. at 375-76.]

These cases demonstrate that the nature and circumstances of a fatal assault may not, in and of themselves, serve as the basis to deny a request for lesser-included offenses if the evidence, viewed in a light most favorable to defendant, supports the charge. When a defendant has established some evidence to support a diminished capacity defense or intoxication defense, as he did in this case, that evidence is critical in deciding whether to submit the lesser-

included offense to the jury. Washington, 223 N.J. Super. at 375. "'[I]f on the evidence it would not be idle to have the jury decide' whether defendant had committed the lesser-included offense, it is error not to charge that offense." State v. Tucker, 265 N.J. Super. 296, 229-30 (App. Div. 1993) (quoting State v. Crisantos, 102 N.J. 265, 278 (1986)), aff'd, 137 N.J. 259 (1994).

Without passing on its credibility, which is, of course, solely the jury's province, the testimony viewed in a light most favorable to defendant demonstrated a life of failed suicide attempts and efforts to "kick" his substance abuse habit. In the fall of 2014, while living with the victims, he relapsed into heroin use and attempted suicide, after which he was hospitalized. Although fully cognizant of the need to treat his mental illness, he did not. Defendant also described a visual hallucination that occurred shortly after his hospitalization.

By early January 2015, defendant was taking Suboxone, Valium, Xanax and Adderall, before work, at work, and in order to sleep. Defendant described a delusion, in which he believed there was a large amount of money hidden in the woods behind his house and went out to look for it. Another time, he took "a large quantity of Xanax or something" and found himself "laying in the snow in the woods."

For at least one week before the homicides, defendant began sending text messages that directly alluded to his suicidal thoughts. Defendant said he thought he was "losing control" and began having delusions that certain people were working against him. He described feeling rage at work directed toward a woman who he believed made up false stories about him at the job site. Some of the text messages could infer, as the prosecutor asserted, defendant's hostility toward both victims. In one, defendant described B.W.'s father as "the devil" and described his "offspring" as devils, ending the text with the question, "When does the cycle stop?"

Defendant described hallucinations at work, and an auditory hallucination at home in which he thought B.W. and her father were plotting to kidnap his daughter. The testimony of Dr. Mosby described defendant's chronic delusional thinking, his "[s]ubstance induced psychosis disorder," and the effect defendant's drug ingestion on the night of the murders had on defendant's "[]ability to understand what's going on with his delusions."

Defendant testified his intention was to take a mix of wine and drugs to make it easier to commit suicide. However, it is clear from these prior incidents and others that defendant was aware of the risk that the combination of drugs and his mental illness posed to his ability to control his behavior. According to

21

the expert testimony, during these psychotic episodes, defendant was unable to understand what was happening.

We are compelled to conclude that a jury could reasonably find that in deciding to ingest what he claimed were large amounts of a potent mixture of drugs and alcohol, defendant "consciously disregard[ed] a substantial and unjustifiable risk that [death would] result from his conduct." N.J.S.A. 2C:2-2(b)(3). Certainly, the proofs "leave room for dispute" on that issue, Tucker, 265 N.J. Super. 330 (citing State v. Sinclair, 49 N.J. 525, 540 (1967)), and therefore the lesser-included offenses of aggravated manslaughter and manslaughter should have been submitted to the jury. We reluctantly reverse and remand the matter for a new trial.

II.

We address the issues raised in Points Two and Three for guidance in the event of a retrial.

As noted, the judge permitted the State to admit certain portions of the audio-recorded statement defendant made to Detectives Pallante and Thompson at the hospital after he was taken from the scene of the homicides. The State moved in limine to admit only a small portion of the entire statement; these portions were, without doubt, relevant to establish a motive for the killings.

A-3442-16T3

Defendant, however, objected and asked that the judge admit the entire statement, arguing it was admissible under the doctrine of testimonial completeness. See N.J.R.E. 106. The judge ordered the prosecutor to include a short portion of the statement wherein defendant stated he tried to commit suicide, and otherwise granted the State's motion.

In Point II, defendant argues he should have been permitted to introduce portions of the statement in which he detailed his mental and substance abuse history and previous suicide attempts and ideations. We disagree.

N.J.R.E. 106 provides: "When a writing . . . or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing . . . which in fairness ought to be considered contemporaneously." The requested portion "may be required to be read if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding." State v. Lozada, 257 N.J. Super. 260, 272 (App. Div. 1992) (quoting United States v. Soures, 736 F.2d 87, 91 (3d Cir. 1984)). "The rule exists 'to permit the trier of the facts to have laid before it all that was said at the same time upon the same subject matter.'" State v. Underwood, 286 N.J. Super. 129, 140 (App. Div. 1995) (quoting State v. Gomez, 246 N.J. Super. 209, 217

(1991)). We review the trial judge's decision in this regard for a mistaken exercise of discretion. Lozada, 257 N.J. Super. at 272.

Here, the judge admitted a portion of the statement in which defendant told the detectives about his suicide attempt, properly concluding that limited portion placed into context why defendant was in the hospital. However, much of the rest of the statement that detailed defendant's drug abuse and mental health issues was not relevant to the portions the State sought to admit, nor was it necessary to place the admitted portions in context or to prevent the jury from being misled. We agree the judge did not mistakenly exercise her discretion in denying the admission of the majority of the remainder of defendant's statement.

However, in a portion of the statement the judge permitted to be redacted, detectives asked defendant directly why he killed the victims; defendant denied the accusation. At another point, defendant expressed belief that his girlfriend was alive and waiting for him outside the room. It was a mistaken exercise of discretion to exclude these from the redacted statement because, although self-serving, they clearly placed the State's proffered reason for admission of portions of the statement — proof of motive for the homicides — in context. Excluding those portions of the statement provided the jury with an unfair and only partial understanding of the admitted portion of defendant's statement. If

24

the case is retried, and the State seeks to introduce the same parts of defendant's statement, the judge shall also admit those portions in which defendant denies committing the crimes or otherwise expresses a belief that the victims are still alive.[7]

Defendant also argues the judge erred in excluding portions of the statement demonstrating his confused state during the questioning. For example, at one point, defendant told detectives he took a whole bottle of Valium and was "seeing four of your eyes right now." At another point, when detectives asked defendant to consent to collection of his DNA, he responded, "Do you think I'm in the state right now to be making any official decisions or anything like that right now? I certainly don't feel like it." Defendant then refused to consent and said he was waiting for his parents.

Although the judge made a preliminary determination that defendant's statement was inadmissible, it is ultimately for the jury to decide whether the statement was actually made and if it was credible. State v. Hampton, 61 N.J. 250, 271 (1972); see also Model Jury Charges (Criminal), "Statements of

---

[7] We note that the judge recognized the restrictive consequence of her pre-trial ruling during the direct examination of defendant and permitted defense counsel some leeway in questioning defendant about whether, when speaking with detectives, he recalled harming the victims.

Defendant," (rev. June 14, 2010). Defendant's statements that arguably demonstrated some mental or physical distress were critical to the jury's function, especially when defendant's mental state was the key issue in the case. If there is a retrial, the jury should be permitted to hear those portions of the statement that permit a full and fair consideration of the issue.

In Point Three, defendant challenges the exclusion of statements he made to a medical technician at the hospital who was dressing his wounds. In a pre-trial hearing, the technician testified that while in the emergency room at the hospital, defendant volunteered that he had taken Xanax and alcohol. Defendant also asked for B.W., his "girlfriend." None of the information provided by defendant was in response to questioning by the technician, and the information was not necessary to treat defendant properly.

The judge ruled the statements to the technician were not admissible under N.J.R.E. 803(c)(4), which generally excepts from exclusion as hearsay out-of-court statements made for the purpose of medical diagnosis or treatment. We agree, and that argument requires no further discussion. R. 2:11-3(e)(2).

The judge also concluded the statements were not admissible under N.J.R.E. 803(c)(3), which excepts from the general exclusion of hearsay good faith statements made by the declarant of his "then existing state of mind . . . ."

She reasoned that defendant made the statement between ten and twelve hours after the incident. This delay permitted fabrication and was not evidence of defendant's <u>present</u> state of mind. <u>See, e.g.</u>, <u>State v. McLaughlin</u>, 205 N.J. 185, 203 (2011) (citing <u>State v. Long</u>, 173 N.J. 138, 154-55 (2002)). In essence, the judge concluded the statement was not relevant to the events surrounding the homicides. We again agree with this analysis, as far as it goes.

Because the issue is not before us, we do not consider whether statements made by defendant to the medical technician are independently admissible to support his defenses of diminished capacity or intoxication if asserted at any retrial. Hearsay is, by definition, an out-of-court statement "offered . . . to prove the truth of the matter asserted." N.J.R.E. 801(c). Defendant's reference to B.W. as his girlfriend was not offered to prove that she was his girlfriend, but rather to demonstrate defendant, in a confused state, thought she was.

III.

Defendant's two remaining arguments do not require much discussion, but we address them for the sake of completeness.

In Point Four, defendant argues the judge mistakenly exercised her discretion in handling a note sent by a juror during deliberations, claiming another juror was "disrespectful and rude." He contends the judge erred by

27

deciding to address the jurors as a group and provide the standard Allen[8] charge to continue deliberations.  Since we are reversing for other reasons, the issue is moot.  However, our review of the record leads us to conclude there was no mistaken exercise of discretion.

In Point Five, defendant contends the judge erred by denying his pre-trial motion to dismiss the indictment.  Defendant asserted that before the grand jury, the prosecutor: (1) "improperly commented on the weight and sufficiency of the evidence"; (2) "failed to present clearly exculpable evidence"; and (3) "failed to instruct the grand jury" on all defenses.  The argument lacks sufficient merit to warrant extensive discussion.  R. 2:11-3(e)(2).  We add only the following.

The prosecutor's comment about the time of death was fleeting and entirely ameliorated by instructions to the grand jurors that nothing he said constituted evidence.  In addition, the prosecutor's failure to introduce evidence of defendant's mental illness, substance abuse, and failed suicide attempt did not violate the tenets of State v. Hogan, 144 N.J. 216 (1996).  That evidence did not directly negate guilt, nor was it clearly exculpatory.  Id. at 237.

Finally, we recognize that the State has a responsibility to instruct the grand jury on relevant defenses as a "corollary to [the] responsibility to present

---

[8]  Allen v. United States, 164 U.S. 492 (1896).

A-3442-16T3

exculpatory evidence." State v. Hogan, 336 N.J. Super. 319, 341 (App. Div. 2001). It is only when there are facts, not expert opinion, that clearly establish the appropriateness of such an instruction that one must be given. Id. at 343-44. A defendant must give written notice of the intention to assert diminished capacity, Rule 3:12-1, and the diagnosis of mental illness generally must be supported by an expert's report. The State had no obligation to instruct the grand jury on this issue.

Defendant argues his statement and blood screens from the hospital provided the State with evidence of intoxication, and therefore, the prosecutor was required to provide the grand jurors with instructions. However, Rule 3:12-1 requires notice as to this issue, too, and, more importantly, the prosecutor was not compelled to introduce this evidence under the Hogan standard. No instruction on intoxication to the grand jury was necessary.

Reversed and remanded for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3442-16T3